XAVIER ZEQUEIRA, demandante, recurrido y recurrente, *v.* MUNICIPAL HOUSING AUTHORITY OF THE CAPITAL OF PUERTO RICO, hoy CORPORACIÓN DE RENOVACIÓN URBANA Y VIVIENDA, demandante, recurrente y recurrida.

*Número:* 12378.  *Resuelto:* 22 de noviembre de 1961.

*Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella, C. Morales, Jr., Elí B. Arroyo y Federico Ramírez Ross, abogados del demandante, recurrido y recurrente; James R. Beverly, R. Castro Fernández y Francisco Castro Amy, abogados de la demandada, recurrente y recurrida.*
Sala integrada por el Juez Asociado señor Belaval, como Presidente de Sala, y los Jueces Asociados señores Santana Becerra y Blanco Lugo.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

Estamos conformes con la ilustrada Sala sentenciadora, que en este caso, el contratista señor Zequeira fue obligado a hacer las terminaciones en las superficies de concreto de los edificios del caserío Luis Lloréns Torres, de acuerdo con la carta de interpretación de fecha 15 de septiembre de 1950 y no de acuerdo con el contrato firmado entre las partes el 12 de septiembre de 1950. La conclusión de hecho, en el

sentido que, "cuando el contratista terminó de levantar las paredes en los edificios C-E, 9-E y 10-B y las presentó a inspección para que la Autoridad demandada aceptara las mismas y certificara el correspondiente trabajo terminado, el ingeniero supervisor de la construcción, representante de la demandada en dicho proyecto, le expresó al demandante que no podía recibir los mismos y que para aceptarlos estos tenían que estar terminados en la forma que requería y exigía la descripción de la carta de interpretación de fecha 15 de septiembre de 1950", representa la versión más correcta de la prueba recibida sobre este particular. El demandante procedió a hacer en el resto de los edificios, las terminaciones en las superficies de concreto en la forma requerida por la demandada.

▮▮▮ Estamos asimismo conformes con la ilustrada Sala sentenciadora que la acción aquí expuesta no está prescrita, bien se consideren los términos de tiempo provistos por el contrato para las diversas reclamaciones o los términos de la prescripción civil ordinaria para las acciones derivadas de las obligaciones implícitas o del enriquecimiento injusto.

Estamos además conformes con la ilustrada Sala sentenciadora, que de acuerdo con el art. 1240 del Código Civil de Puerto Rico, —31 L.P.R.A. sec. 3478— "la interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad", sobre todo cuando se trata de los llamados contratos de adhesión, o sea, aquellos contratos en que una sola de las partes dicta las condiciones del contrato que ha de aceptar la otra, situación típica del contrato de obra pública, en el cual las condiciones generales del contrato están contenidas en un modelo o formulario preparado de antemano por el propietario.

▮▮ El hecho que se trate de un contrato entre el Estado y una persona particular no debe considerarse como una excepción. Como se resolvió en el caso de *Rodríguez* v. *Municipio*, 75 D.P.R. 479 (Belaval) (1953), cita precisa a la pág. 494:

"Cuando un gobierno contrata con una persona particular, el contrato hay que interpretarlo como si se tratara de un contrato entre dos personas particulares": *United States* v. *Smoot*, 15 Wall 36, 21 L. ed. 107 (Miller) (1873), *The Amoskeag Manufacturing Company* v. *United States*, 17 Wall 592, 21 L. ed. 715 (Miller) (1873), *Reading Steel Casting Co.* v. *United States*, 268 U.S. 186, 69 L. ed. 907 (Butler) (1925)". Véase además *Lynch* v. *United States*, 292 U. S. 571, 78 L. ed. 1434 (Brandeis) (1934), cita precisa a la pág. 579 U. S., 1440 L. ed.; *S.R.A.* v. *Minnesota*, 327 U. S. 558, 90 L. ed. 851 (Reed) (1946), cita precisa a las págs. 564 U. S. 857 L. ed.; *Woodbury* v. *United States*, 192 F. Supp. 924 (Kilkenny) (1961), cita precisa a la pág. 925.

◼ Sabido es que el contrato de adhesión presenta el fenómeno de una reducción al mínimo de la bilateralidad contractual. O puesto en las palabras de Castán:

"La moderna doctrina, a partir de Seleilles, viene llamando contratos de adhesión a aquellos en que el contenido, esto es, las condiciones de la reglamentación son obra de una sola de las partes, de tal modo que el otro contrayente no presta colaboración alguna a la formación del contenido contractual, quedando así sustituída la ordinaria determinación bilateral del contenido del vínculo por un simple acto de aceptación o adhesión al esquema predeterminado unilateralmente.

"Viene ligada esta especie de contratos al fenómeno económico de la posición privilegiada que, por diversos motivos (por ejemplo, para poderse ejercitar un monopolio de derecho o de hecho), tiene una de las partes respecto de la otra. En este sentido, define Messineo al contrato de adhesión como aquel en que se actúa, por parte del contrayente económicamente más fuerte, la imposición de determinadas cláusulas o del completo esquema del contrato, en sentido ventajoso para él y en detrimento del otro contrayente, el cual, siendo económicamente más débil, no tiene libertad de escoger, sino entre aceptar aquellas cláusulas o aquel esquema, o renunciar a la celebración del contrato.

"Casos muy frecuentes de contratos de adhesión son los de seguros, transportes, suministros de agua, gas y electricidad, contratos bancarios, etc.

"Con respecto a tales contratos, que han provocado una extensa literatura, se ha discutido especialmente el problema de su naturaleza jurídica y el de sus efectos e interpretación.

"En orden a la naturaleza, ha habido dudas sobre si el contrato de adhesión representa un verdadero contrato o más bien un acto unilateral o de estructura no unitaria; pero la opinión predominante resuelve la cuestión en el primer sentido, fundándose, atinadamente, en que la adhesión implica consentimiento y basta para formar el contrato.

"En orden a los efectos trátase de determinar—toda vez que son notorios los graves peligros que, al lado de indudables ventajas, por razón de celeridad, uniformidad, etc., para las empresas y aun para la economía general, traen consigo para el público los contratos de adhesión—qué medidas de prevención o reacción jurídica, legislativa o judicial, podrán evitar las iniquidades a que se presta esta especie de contratos, asegurando el equilibrio contractual que la hegemonía económica de las grandes empresas tiende a destruir.

"Las legislaciones modernas nos dan ya empleo de esa intervención legislativa dictando disposiciones generales que limitan la eficacia de las cláusulas preestablecidas unilateralmente por las empresas (v. arts. 1,341 y 1,342 del nuevo Código Civil italiano), o, simplemente, disposiciones especiales para determinados contratos (por ejemplo, las de fiscalización administrativa de los seguros).

"Más dudoso es que tengan los jueces, una vez formalizados los contratos de adhesión, medios para evitar las injusticias a que puedan conducir. Se ha sostenido que en tales contratos el juez tiene un poder excepcional de interpretación que le autoriza para no aplicar las cláusulas del contrato más que en consideración de la situación particular de las partes, e incluso un poder de revisión que le autorizaría a modificar el contrato en la parte que apareciera como injusta. Pero es muy aventurado suponer que, ante el silencio de la ley, pueda ser atribuída a los contratos de adhesión una naturaleza jurídica propia que permita no aplicarles las reglas generales de los contratos. Por fortuna, tratándose de nuestro Derecho, hay una base en el Código Civil

para aplicar a los contratos de que se trata un criterio especial de interpretación. Como habrá sido la empresa que dictó las condiciones del contrato la que ha dado lugar a la imprecisión o vaguedad que se observa en las cláusulas del mismo, ha de ser ella la que debe sufrir las consecuencias, conforme al artículo 1,288, (art. 1240 nuestro).

"Con referencia al contrato de seguro, la sentencia de 13 de diciembre de 1934, confirmada por la de 27 de febrero de 1942, declaró que ante una cláusula oscura debe tenerse en cuenta que el seguro es, prácticamente, un contrato de adhesión, y por consiguiente, en caso de duda sobre la significación de las cláusulas generales de una póliza, redactada por la compañía sin intervención alguna de sus clientes, se ha de adoptar, de acuerdo con la regla del art. 1.288 del Código, (art. 1240 nuestro) la interpretación más favorable al asegurado, ya que la oscuridad es imputable a la empresa aseguradora, que debía haberse expresado más claramente."

3 Castán—Derecho Civil Español, Común y Foral—332–334. (octava edición del Instituto Editorial Reus de 1954) ; véase además: II—Volumen I Puig Brutau—Fundamentos de Derecho Civil, 303–304 (edición de la casa Editorial Bosch de 1954) ; Sentencia del Tribunal Supremo de España de 13 de diciembre de 1934—216 Jurisprudencia Civil 317 (edición de la Editorial Reus S. A. de 1935) ; *Maryland Casualty Company* v. *San Juan Racing Association, Inc.*, 83 D.P.R. 559 (Dávila) (1961), cita precisa a la pág. 566.

Examinadas las cláusulas referentes a la terminación de superficies contenidas en el contrato y la carta de interpretación de 15 de septiembre de 1950, es indudable que por la segunda se exige un trabajo de terminación distinto, más elaborado y costoso, y rectamente aplicado el principio de interpretación del art. 1240 a un típico contrato de adhesión, dicha carta puede considerarse como una novación, una exigencia adicional al pliego de condiciones de acuerdo con el art. 1485 del Código Civil de Puerto Rico, 31 L.P.R.A. 366, sección 4126, produciéndose el cambio en el plano—incluido

en el concepto "plano" el de "pliego de condiciones" 24—2da. Parte Scaevola—Código Civil 132 (Segunda edición del Instituto Editorial Reus de 1951) que da derecho a pedir aumento de precio.

■ Ahora bien, no podemos estar conformes con el método utilizado por la ilustrada Sala sentenciadora para determinar el *aumento de precio* por aumento de obra según lo autoriza el art. 1485 de nuestro Código Civil. Después de haber determinado correctamente, como conclusión de derecho, que la demandada venía obligada a satisfacer al demandante "el costo adicional en que incurrió en las terminaciones", tal parece que decidió buscar el valor razonable en vez de buscar el aumento en precio o el costo adicional. A primera vista, parece que se trata de la misma cosa, pero no lo es.

El valor razonable (*quantum meruit*) se usa cuando se trata de una obligación implícita que surge de un contrato invalidado por alguna irregularidad en la forma de ejecutarlo: 43 American Jurisprudence 833, Sección 89. El aumento en precio es el que resulta de una orden de cambio o de una exigencia adicional que produce, a su vez, un aumento en los jornales o materiales. En el primero se trata de un precio pericial, supuesto un contrato de obras sin precio: Sentencia del Tribunal Supremo de España de 22 de noviembre de 1869—20 Jurisprudencia Civil 570 (edición de la Imprenta de la Revista de Legislación de 1869) recogida por Cámara en su tratado de "Agrimensura y Arquitectura Legal" pág. 537, (cuarta edición de Carlos Bailly—Bailliere de 1871) ; en el segundo se trata de un precio reconciliado en un contrato de obras con precio fijo.

■ La ilustrada Sala sentenciadora tomó como base el valor razonable de la terminación de 312,800 yardas cuadradas de superficie de concreto, exceptuando pisos y lozas, e incluyendo el beneficio razonable para el contratista, montante a $240,300. Entonces, dedujo del mismo la suma de

$186,400 fijado por el contratista señor Zequeira en su propio estimado con referencia al contrato original, llegando a la conclusión que el costo adicional de las terminaciones sería la diferencia entre ambas sumas, sumadas además el 1.5% de la nómina adicional por seguro social y el 3.2% de la nómina adicional por indemnizaciones a obreros,—calculadas éstas a mitad de la diferencia por corresponder a la mano de obra sólo la mitad del *aumento en precio:* $53,900, $404.25, y $862; en total $55,166.25.

En cuanto al primer valor pericial hay una objeción seria: la propia declaración del perito, en el sentido, que no había tomado en cuenta los planos de construcción, demuestra que no descontó las superficies de los "claros", y consideró todas las estructuras como "macízos" tratándola como un cuerpo monolítico contínuo. En cuanto al estimado del contratista con relación al contrato original, hay otra objeción seria: la prueba demuestra que esos estimados eran desgloses arbitrarios para los pagos parciales autorizados por el contrato—véase el renglón 31 (b) de las Especificaciones y Condiciones Generales del contrato pág. 50—"y no deberán ser considerados como que fijan una base para aumentos o deducciones del precio del contrato". Se trata, pues, de un valor figurativo dentro de la mecánica del pago parcial.

Las bases para el cómputo del *aumento en precio* tendrían que ser diferentes. Lo primero, establecer cuanto hubiera sido el precio de la mano de obra y de los materiales para las terminaciones comprendidas en la controversia según los términos del contrato original de 12 de septiembre de 1950.

Lo segundo, cuanto resultó ser el precio de la mano de obra y de los materiales para las terminaciones comprendidas en la controversia de acuerdo con los términos de la carta de interpretación de 15 de septiembre de 1950. Como ya no se trata del valor razonable sino de un *aumento en precio*, la única base para añadir a dicho costo de mano de obra y materiales, las pólizas del seguro social y de la indemnización a

obreros sería el aumento en el personal obrero y la extensión en el tiempo adicional que requirió la terminación del contrato.

En su recurso ante nos, el contratista alega que de ciertas partidas marcadas con lápiz rojo en sus nóminas de salarios, se puede deducir el costo de la mano de obra empleada en las terminaciones de superficies pues dichas partidas representan el desglose correspondiente. También existe un desglose sobre las listas de materiales suficiente para determinar el costo de los materiales usados en dichas terminaciones. Por el contrario, la recurrida alega, que de acuerdo con sus partes diarios, se puede determinar durante que fechas fijas y en que porciento se trabajó en dichas terminaciones; hay alguna prueba de que materiales incluidos como costo de las terminaciones corresponden a otros trabajos. Por haber usado el método de "costo razonable" y no de "aumento en precio", la ilustrada Sala sentenciadora no resolvió nada sobre estos aspectos importantísimos de la prueba.

Hemos examinado el volumen impresionante de datos que contiene dicha evidencia y francamente entendemos que para reconciliar los números que arrojan las nóminas y las listas de materiales con los partes diarios de la Autoridad que demuestran, más o menos, la clase de trabajo y las fechas en que se hizo dicho trabajo, la ilustrada Sala sentenciadora necesitará de un perito del Tribunal, para que conjuntamente con los peritos de las partes, o solo, proceda a realizar dicho trabajo, pues de dicho análisis depende que se pueda determinar, con el mayor grado de certeza posible, el costo de las terminaciones de acuerdo con la carta de interpretación para compararlo con el costo de dichas terminaciones de acuerdo con los términos del contrato. Esto sería más aconsejable que descansar en los desgloses de dichas partidas presentadas por la partes. Puede ser que la ilustrada Sala sentenciadora prefiera celebrar vistas adicionales para esclarecer algunos puntos dudosos. Lo mejor es dejar al sano juicio de la Sala

sentenciadora, de acuerdo con la amplia potestad que tiene un tribunal de hecho para dirigir sus procedimientos, lo que ella considere más conveniente para llegar a la determinación final del *aumento en precio:* Regla 71 de las de Procedimiento Civil.

*Debe revocarse la sentencia, de acuerdo con los términos de esta opinión, en todo lo que se refiera a la forma como se determinó el aumento en precio*