Fondo del Seguro del Estado, demandante y recurrido, *v.* Ángel Peña Plaza y Thelma Berdiel de Peña, demandados y recurrentes.

*Número:* R-70-283     *Resuelto:* 26 de abril de 1972

*Vicente Pérez Díaz,* abogado de los recurrentes; los abogados del recurrido no comparecieron.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Los recurrentes suscribieron un pagaré a la orden de la Housing Investment Corporation,([1]) en lo sucesivo denominada la Housing, por la suma de $11,550.00. Devengaba intereses a razón del 6% por año sobre el balance insoluto. Era pagadero en plazos mensuales de capital e intereses de $74.50 cada uno, comenzando en el día primero de mayo de 1967 y vencía en el primero de abril de 1992. Fue garantizado con primera hipoteca sobre el solar Núm. 20, y casa de vivienda en la calle Algeria de la Urbanización Puerto Nuevo. Dicho pagaré dispone que en caso de que la falta de pago de una mensualidad a su vencimiento no se cure mediante su pago antes del vencimiento de la siguiente mensualidad, la totalidad de la obligación y sus intereses acumulados quedarían vencidos sin aviso alguno, a opción del tenedor, quien podrá exigir su pago; que el no hacer uso de este derecho opcional, no constituye una renuncia de su ejercicio en caso de un incumplimiento subsiguiente. Este pagaré fue endosado sin recurso por la Housing al recurrido, constituyéndose aquélla como agente de cobro del recurrido con motivo de lo cual presta "el servicio de cobro y gestiona el pago de obligación."

La prueba aducida fue la siguiente:

(1) El récord de pagos de mensualidades anteriores, hechos por los recurrentes demuestra que los pagos no se hacían el primero de cada mes sino varios días después; que se hicieron siempre antes del vencimiento de la siguiente

---

([1]) La Housing endosó el pagaré a favor del recurrido, Fondo del Seguro del Estado.

mensualidad con excepción de la del primero de julio de 1967 cuyo pago fue aceptado en 28 de agosto de 1967 junto con la mensualidad de este último mes.

(2) Testificó el gerente de cobro de la Housing que los recurrentes dejaron de pagar las mensualidades vencidas el día primero de los meses de marzo y abril de 1969; que el 2 de dicho mes de abril se reunió con varios empleados para determinar cuáles casos habían de ser declarados vencidos; que se tomó en consideración el referido récord de pago de los recurrentes demostrativo de que habían incumplido su contrato en siete ocasiones anteriores; que a marzo de 1969 el balance insoluto del principal de pagaré en cuestión era la suma de $11,161.51; que en vista del récord de incumplimiento de los recurrentes, de que no había ninguna comunicación de parte de éstos a pesar de las gestiones de cobro que se hicieron, se procedió a declarar la deuda vencida; que se continuaron las gestiones de cobro ". . . a ver si teníamos alguna respuesta de parte de él en cuanto a esta obligación. No hubo respuesta alguna"; que se invitó por carta al señor Peña a pasar por la oficina para discutir su caso pero no compareció; que entonces se procedió a recomendar el caso para ejecución de hipoteca. Admitió que un cheque librado por el Sr. Peña a favor de la Housing en 24 de abril de 1969 "por $206.04 estuvo en nuestra oficina" (este cheque cubría las mensualidades de marzo y abril de 1969 más determinados recargos); que se recibieron dos cheques por $103.02 cada uno y uno por $25 librados por el Sr. Peña a favor de la Housing en 3 de junio de 1969, más otro "con fecha de 19 de julio de 1969 por la cantidad de $103.02." Todos estos cheques fueron certificados en 20 de junio de 1969 una vez devueltos a los recurrentes, con excepción del último. Testificó dicho gerente que ". . . Ya que había declarado vencida la deuda desde abril 2 . . . [1969] no se aceptaron las remesas"; que se le devolvió el cheque de $206.04 para el primero o el día dos de mayo de 1969.

El deudor, Sr. Peña, admitió que estaba atrasado dos meses; que entonces la Housing le envió "una carta solicitando las mensualidades atrasadas y $25.00 de honorarios de abogado por retraso", cantidad que él remitió; que los cheques le fueron "devueltos con una carta notificándome que habían decidido ejecutar la totalidad"; que ". . . me había retrasado en otras ocasiones más o menos dos meses y había pagado los dos meses con sus correspondientes recargos y no creía que en esta ocasión iba a ocurrir esto no, y eso fue al ser notificado de que había una ejecución de hipoteca por el medio y, esto, naturalmente a fines de abril"; que ". . . No era porque no tuviera el dinero. Me retrasaba y después pagaba dos meses." Testificó que no visitó las oficinas de la Housing; fue a ver su propio abogado quien se comunicó con la Housing donde le confirmaron que habían decidido ejecutar la hipoteca; que luego hizo un cheque en 17 de enero de 1970 por $404 para cubrir cuatro mensualidades luego de radicada la ejecución. Por último testificó que no vive sino que tiene alquilada la propiedad objeto de la ejecución.

El tribunal concluyó que los recurrentes no pagaron la mensualidad de abril de 1969 a su debido tiempo. En tal virtud los condenó a pagar al recurrido $11,161.51 de principal más intereses al 6% desde febrero de 1969 hasta su pago total, más $25.50 adeudados mensualmente a partir del primero de marzo de 1969 hasta su pago total por concepto de contribución sobre la propiedad, primas de seguro, primas F.H.A., y por servicios y recargos en el manejo del préstamo, más la suma de $1,155 de costas, gastos y honorarios de abogado. En caso de no pago, entre otras cosas, ordenó al Alguacil vender la propiedad en subasta pública para satisfacer con el producto de dicha venta el pago de dicha reclamación.

Apuntan los recurrentes que:

1.—Al aceptar los pagos de 24 de abril de 1969 más uno de $25 los que no se les devolvieron hasta el 11 de junio de 1969, renunció el recurrido a cualquier incumplimiento por los

recurrentes. No tienen razón. No resolvimos una cuestión como ésta en *Housing Inv. Corp.* v. *Sosa,* 98 D.P.R. 247 (1970). Además, las circunstancias son muy distintas en este caso pues el récord demuestra que la devolución se hizo con razonable prontitud, el primer día o el día dos de mayo de 1969 y no en 11 de junio siguiente que fue cuando se devolvieron los cheques por $103.02 suscritos y enviados a la recurrida unos días antes de esta última fecha.

2–3.—Los recurrentes pagaron los recargos que se les exigieron dentro de los pagos que hicieron por medio de los cheques previamente relacionados, pagos que hicieron en 24 de abril de 1969 antes de declararse vencida la totalidad de la deuda mediante la demanda radicada en 13 de junio de 1970. Este apuntamiento es inmeritorio. La prueba demuestra que los recurrentes no pagaron la mensualidad de marzo en abril como lo exigía el pagaré. Cuando enviaron el pago en 24 de abril de 1969 ya habían incurrido en una falta de pago que permitía a la recurrida ejercer, como ejerció, la opción que se proveyó en el pagaré al efecto de que en ese caso el tenedor podía exigir el pago total del principal de dicha obligación. Esta opción se ejercitó, según el testimonio no controvertido del gerente de la Housing, luego de agotar ésta esfuerzos razonables para que el recurrente curase su falta de pago.

4.—El tribunal de instancia incidió al no aplicar a este caso lo resuelto en *Housing Inv. Corp.* v. *Sosa,* supra, *Housing Inv. Corp.* v. *Benés,* Sentencia de 16 de junio de 1970; *Seamen's Bank* v. *Sucn. Sepúlveda,* 99 D.P.R. 279 (1970). Este apuntamiento carece de fundamento ya que las circunstancias de este caso, previamente relacionadas, establecidas en la vista del caso en los méritos, no justificaban la aplicación al mismo de norma alguna puntualizada en los citados casos en que se trataba de la procedencia de una sentencia sumaria.

5.—Constituyó error el declarar con lugar la demanda de ejecución de hipoteca sin estar inscrita la hipoteca a favor del recurrido como cesionario de dicha obligación.

■ En *Srio. de Hacienda* v. *Tribunal Superior*, 95 D.P.R. 436 (1967), en que se trataba de la cesión de un pagaré hipotecario suscrito a la orden de determinada persona, dijimos que la hipoteca inscrita en garantía del mismo subsistía en toda su efectividad no obstante haberse embargado la finca hipotecada meses antes del endoso del pagaré por su librador a favor del cesionario; que las hipotecas constituidas en garantía de obligaciones transferibles por endoso, como lo es la del caso ante nos, están autorizadas por el Art. 153 de la Ley Hipotecaria (30 L.P.R.A. sec. 266). Dicho artículo específicamente dispone que en estos casos de cesión "... se entenderá éste transferido con la obligación o con el título, *sin necesidad de dar de ello conocimiento al deudor ni de hacerse constar la transferencia en el registro.*" (Énfasis nuestro.)

Los casos citados por el recurrente no son de aplicación pues se refieren a la necesidad de (1) la inscripción de la hipoteca en sí; (2) la inscripción de la cesión de ésta y no de las obligaciones transferibles por endoso garantizadas con hipoteca; y a (3) la subhipoteca—Arts. 146 y 152, Ley Hipotecaria—(30 L.P.R.A. secs. 259, 265); *Schroder* v. *Registrador*, 84 D.P.R. 336, 339 (1962). En el caso ante nos no se trata de alguna de estas circunstancias.

■ 6.—Se arguye, sin argumentar y sin citar la ley en apoyo del aserto, que no se incluyó en esta acción a la Federal Housing Administration que por haber asegurado el préstamo era parte interesada en el mismo. No tiene razón. Nada se dispone en el National Housing Act (12 U.S.C.A. secs. 1709–1710) ni en nuestra legislación que sostenga este apuntamiento.

7.—Fue errónea la condena de $1,155 "de las costas, gastos y honorarios de abogado hipotecariamente garantizados." Tiene razón. El pagaré en cuestión está redactado en inglés y en español, línea por línea, cosa común en este tipo de operaciones. Existe, sin embargo, una falta de completa concordancia entre ambos textos en cuanto a la obligación de

pagar las costas, desembolsos y honorarios de abogado en caso que haya que recurrir a los tribunales para cobrar todo o parte del monto del pagaré. Mientras el texto en inglés dispone que "the subscriber agrees to pay the court expenses, disbursements, and attorney's fees *which may be incurred in the amount of ONE THOUSAND ONE ($1,155.00)"*, el texto en castellano lee así "el subscribiente se obliga a satisfacer *todas las costas y honorarios de abogado en que se incurra por el acreedor hasta la suma de HUNDRED FIFTY FIVE - Dólares ($———)."* (Énfasis nuestro.)

Es evidente, en primer lugar, que al redactarse el pagaré en inglés y en castellano, línea por línea, no se dejó suficiente espacio en blanco para escribir la cuantía convenida en cuanto a costas y honorarios de abogado en ambos idiomas, de manera que se insertó sólo en el idioma inglés. De esto no se queja el recurrente quien no cuestiona que la cuantía máxima convenida es la suma de $1,155.

Apunta el recurrente, sin embargo, que él se obligó a pagar sólo la cuantía incurrida por concepto de costas y honorarios de abogado hasta la suma de $1,155, como aparece claramente del texto castellano del pagaré.

Como el pagaré aparece impreso con sólo unos blancos a ser llenados a maquinilla, es evidente que fue suplido e impuesto por la Housing. De manera que la interpretación de su disposición sobre costas y honorarios en que surge una aparente discrepancia entre los dos textos usados, debe favorecer al deudor en este caso. Art. 1240 del Código Civil, 31 L.P.R.A. sec. 3478; *Prieto* v. *Hull Dobbs Co.*, 88 D.P.R. 420 (1963); *Zequiera* v. *CRUV*, 83 D.P.R. 878 (1961). A esos efectos debemos tratar de conformar, de ser esto posible, el texto inglés al texto castellano.

Concluir, como concluimos, que el texto inglés en cuestión en efecto quiere decir lo mismo que el texto castellano de la disposición en cuestión, o sea, que el recurrente sólo se

obligó a pagar las costas y honorarios que se incurrieran hasta la cantidad de $1,155, no constituye una interpretación forzada reñida con los términos en inglés de la disposición. En el texto inglés se provee para el pago de las costas y honorarios "which may be incurred", o sea, que "puedan incurrirse", de manera que cuando a continuación se estipula "in the amount of $1,155.00" es lógico y razonable concluir que a esta frase se le quiso dar el significado de que era un máximo o límite a tal responsabilidad, es decir, que ésta se asumía *hasta* esa cantidad, como reza el texto castellano.

En vista de lo expuesto, *debe devolverse el caso al tribunal de instancia con el fin de que determine, previa vista al efecto, la cuantía realmente incurrida por el recurrido por razón de las costas y honorarios de abogado. En estos extremos debe modificarse la sentencia y así modificada se confirmará.*

El Juez Presidente, Señor Negrón Fernández, no intervino.