La Jueza Asociada Señora Fiol Matta
emitió la opinión del Tribunal.
Debemos resolver si un urbanizador o constructor, contra quien pende una querella en el Departamento de Asun-tos del Consumidor por deficiencias en una propiedad op-cionada, queda liberado de responsabilidad por prácticas indeseables de construcción —según definidas por la Ley Núm. 130 de 13 de junio de 1967 (Ley 130), 17 L.P.R.A. see. 501 et seq., y el Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Cons-trucción de Viviendas Privadas en Puerto Rico del Depar-tamento de Asuntos del Consumidor, Reglamento Núm. 2268 del Departamento de Estado, 17 de agosto de 1977 (el Reglamento)— si se firma la escritura de compraventa antes de resolverse la querella. Ello conlleva determinar si *699 los compradores que firman una escritura de compraventa, según la cual aceptan el inmueble “sin reservas”, renun-cian por esa sola razón a una reclamación previamente presentada y pendiente de adjudicación.
I
P.R.D., L.P. —antes conocido como Sabanera Real, Inc.— y Century Development Group (los desarrolladores), fueron los gestores de la urbanización “Savannah Real” en el Municipio de San Lorenzo. El 5 de junio de 2000, el Sr. Daniel Suárez Figueroa y su esposa Maribel Velázquez Rosa (los compradores) otorgaron un contrato de opción de compraventa titulado Contrato Uniforme de Compraventa, con Sabanera Real, Inc., para la adquisición de la unidad A-11, modelo Sevilla, del proyecto. En las especificaciones iniciales se indica que la terminación de los plafones del techo interior de las unidades sería “skim coat plaster” o empañetado.
El 12 de noviembre de 2001, el señor Suárez Figueroa envió una carta al Sr. Franklin López, de Century Development Group, para informarle que había visitado el pro-yecto y observado “que la terminación del plafón de las unidades ha sido cambiado a estucado a diferencia de lo que indican los planos de construcción donde muestra que deben ser empañetado”. Apéndice de la Petición de certio-rari, pág. 2. Solicita entonces al señor López “que inter-venga en esta situación específicamente en la unidad A-11”, que era la que él había opcionado, junto a su esposa. Id. Poco tiempo después, el 25 de noviembre de 2001, el señor Suárez Figueroa escribió nuevamente, esta vez a “Proyecto Savannah Real” para informar que el plafón interior no se había empañetado debidamente. Ese mismo día, el Ing. Jaime López, de P.R.D., L.P., le envió al señor Sánchez Figueroa la copia de un memorando escrito por el Ing. Rafael E. Torrellas, en el que éste expresaba lo si- *700 guíente: “Como a la unidad del cliente aún no se le ha aplicado el estucado interior y solamente tiene el Skim coat sugiero qüe con una carta del cliente aceptándolo, lo dejemos así y lo pintemos”. Apéndice de la Petición de cer-tiorari, pág. 44. Solicita, entonces, que el señor Sánchez Figueroa le indique por escrito lo que desea hacer. El 12 de diciembre, el señor Sánchez Figueroa contestó esta misiva, informando nuevamente que rechazaba la terminación en. estucado y que debía dársele al plafón la terminación que indica el plano.
El 17 de diciembre de 2001, los desarrolladores, por me-dio de sus abogados, comunicaron a los compradores que a su entender , la terminación en estucado o, “pearl-tex” me-jora la apariencia de los techos, “[p]ero como usted insiste en su posición le informamos que si no está satisfecho con la terminación de los plafones de su futura casa ... nuestro cliente está en la disposición de rescindir el contrato y de-volverle íntegramente todo el dinero que usted ha pagado como opción o parte del pronto para la compra de su unidad”. Apéndice de la Petición de certiorari, pág. 48. El 29 de enero de 2002, los compradores respondieron por es-crito a esta misiva. Informaron que no tenían interés en resolver el contrato de compráventa y, por el contrario, “queremos seguir con el contrato de compra de la unidad A-ll”. No obstante, solicitaron que se paralizaran los tra-bajos en los plafones interiores de la casa, “ya que hemos radicado una querella en . el Departamento de Asuntos del Consumidor para que sea éste el que determine cuál es la terminación que por derecho corresponde aplicarle a las unidades”. Id., pág. 157.
Ese mismo día, los compradores presentaron una quere-lla ante el Departamento de Asuntos del Consumidor (DACo), en la cual indicaron que no estaban dispuestos a aceptar el cambio en la terminación de los plafones y soli-citaron “que se trabajen los plafones de acuerdo a los pla-nos de ARPE y/o que el Departamento tome acción como *701 corresponda en ley”. Apéndice de la Petición de certiorari, pág. 157. Pendiente aún la querella en DACo, el 28 de fe-brero de 2002 los compradores adquirieron la unidad A-ll. La vista para dilucidar la querella se celebró el 1 de julio de 2002 y el 13 de noviembre de 2002 se emitió el dictamen recurrido.
DACo resolvió que los desarrolladores violaron la Ley de la Oficina del Oficial de Construcción adscrita a la Admi-nistración de Renovación Urbana y Vivienda, 17 L.P.R.A. see. 501 et seq. (Ley del Oficial de Construcción), al alterar los planos aprobados por la Administración de Reglamen-tos y Permisos (ARPe) “de manera unilateral y sin notificación”. Específicamente, resolvió que se violó el Art. 9(c) de dicha ley, 17 L.P.R.A. sec. 509(c), que prohíbe, en lo pertinente, la alteración de los planos aprobados sin que antes se haya avisado “a los optantes y/o compradores, me-diante correo certificado con acuse de recibo con por lo me-nos veinte (20) días de ántelación a la presentación de las enmiendas solicitadas”.
A la luz de esta determinación, la agencia ordenó a los desarrolladores remover el terminado de “pearl-tex” o es-tucado, y aplicar en su lugar el terminado “skim coat plaster”, que era el previsto en el plano aprobado por ARPe para el techo de la residencia de la parte querellante. De incumplir con esta orden, los querellados estarían obliga-dos solidariamente a pagarle a los querellantes la suma de tres mil quinientos dólares.
En reconsideración, la agencia se reafirmó en su deci-sión de ordenar que se terminara el techo de la residencia de los querellantes, conforme a los planos aprobados por ARPe. Además, señaló una vista evidenciaría para que las partes presentaran “prueba del costo de remoción y aplica-ción del terminado del techo en la residencia en controversia”. Apéndice de la Petición de certiorari, pág. 22. Esto a ruego de los querellantes, quienes alegaron que los trabajos de remoción del estucado y empañetado costa- *702 ban más que la penalidad impuesta en la resolución en caso de incumplimiento.
Presentado el recurso de revisión ante el foro apelativo, los desarrolladores argumentaron principalmente que DACo erró al descartar prueba documental que, según ale-gaban, mostraba que los querellantes habían aceptado la obra sin reserva o reclamo de clase alguna. Relacionado con esto, argumentaron que la agencia erró al interpretar que el incumplimiento con el requisito de notificación de cambios era una práctica indeseable de construcción. El Tribunal de Apelaciones revocó la resolución recurrida y resolvió que los compradores habían condonado el incum-plimiento de los desarrolladores con los planos, al firmar la escritura de compraventa sin expresar objeción alguna y sabiendo que se habían cambiado las terminaciones del techo. Para llegar a esta conclusión, el foro apelativo se fundamentó en la cláusula séptima de la escritura, que expresa que los compradores: “(a) han inspeccionado la propiedad objeto de esta compraventa[,] (b) la propiedad ha sido aceptada luego de tal inspección la que, a su mejor entender, se encuentra libre de defectos o vicios de cons-trucción y la adquiere y acepta como está (as-is) [sic] sin reclamo o reserva de clase alguna”. Apéndice de la Petición de certiorari, pág. 54.
Recurren ahora los compradores, alegando que el Tribunal de Apelaciones erró al revocar a DACo “y negarse a aplicar lo resuelto en Pacheco v. Estancias de Yauco”. Los peticionarios aducen que, no obstante lo expresado en la escritura de compraventa, cumplieron con el requisito de protestar los vicios ostensibles que conocían y recibieron el edificio sujeto a reserva. Entienden que con su rechazo, consistente en el cambio de la terminación del plafón interior, la presentación de la querella el 29 de enero de 2002 y, particularmente, sus expresiones en la carta dirigida a los desarrolladores ese mismo día, se reservaron el derecho de continuar con su caso en DACo y, por ende, no renunciaron *703 al remedio provisto al amparo del Art. 9(c) de la Ley del Oficial de Construcción, supra. Argumentan los peticiona-rios que la decisión del Tribunal de Apelaciones dejaría en las manos de los constructores de hogares el uso de “argu-cias”, como las que alegan que fueron utilizadas en la es-critura de compraventa de este caso, para castigar a la parte más débil en la relación contractual. Por eso, expo-nen que hay razones de orden público para impugnar la validez de la cláusula séptima de la escritura.
Los recurridos, por su parte, se amparan en que el cam-bio en la terminación del plafón no constituye un vicio de construcción ni es causa de ruina funcional o de cualquier otra clase. Por eso, el Art. 1483 del Código Civil, 31 L.P.R.A. see. 4124, no es pertinente al caso de autos y, por consiguiente, tampoco lo es nuestra decisión en Pacheco v. Estancias, 160 D.P.R. 409 (2003). Asimismo sostienen que el cambio es una mera modificación a los planos y las es-pecificaciones del proyecto que fue posteriormente apro-bado por ARPe. Principalmente, se apoyan en la cláusula séptima de la escritura de compraventa, según la cual los compradores aceptaron la propiedad “como está” (“as is”), sin reserva alguna. Rechazan que esta cláusula constituya una argucia y aducen que es, más bien, “una expresión clara e inequívoca de la voluntad de dicha parte, quien adquiere la propiedad sin reclamo o reserva de clase al-guna, incluyendo la renuncia a los reclamos por los cam-bios en la terminación del techo de la residencia”. Apéndice de la Petición de certiorari, pág. 54. Por haber aceptado la propiedad “como está”, concluyen que no hubo incumpli-miento de contrato. Más aún, alegan que fue a ellos, los desarrolladores, a quienes se les violó su confianza, en tanto descansaron en que los compradores renunciaban a su reclamación ante DACo al firmar la escritura de compraventa.
Expedimos el auto de certiorari el 16 de marzo de 2004 y, luego de una paralización por procedimientos pendientes *704 ante el Tribunal de Quiebras, pasamos a resolver con el beneficio de la comparecencia de ambas partes.
II
En Pacheco v. Estancias, supra, pág. 430, resolvimos, en esencia, que “la recepción definitiva del edificio no libera al contratista de responsabilidad por los vicios que causan la ruina del inmueble, sean éstos ocultos o aparentes, cuando estos últimos, perceptibles a simple vista, constituyen un incumplimiento del contrato de construcción”. Resulta evidente que esta decisión descansa en que los vicios de construcción alegados, después de que se recibe la obra, tanto los ocultos como los aparentes, conllevan la ruina del inmueble, algo que no sucede en este caso. Además, en Pacheco v. Estancias, supra, aclaramos que, por la naturaleza de los vicios alegados, la situación se ubicaba dentro del marco normativo del Art. 1483 del Código Civil, supra, y no en las disposiciones del Reglamento. En este caso, como veremos, sucede todo lo contrario. Por eso, el foro apelativo no se equivocó al negarse a aplicar la doctrina de Pacheco v. Estancias, supra, a los hechos de este caso. Sin embargo, ello no es suficiente para disponer del recurso, según explicamos a continuación.
DACo es la agencia llamada a proteger los intereses de los compradores de viviendas en Puerto Rico y de los consumidores en general. Como ya hemos apuntado en ocasiones anteriores, esta agencia fue creada mediante la Ley Núm. 5 de 23 de abril de 1973 (3 L.P.R.A. see. 341 et seq.), con el propósito primordial de vindicar e implementar los derechos del consumidor. Conforme a este propósito se le concedieron amplios poderes, entre los cuales se incluyeron específicamente los siguientes:
(d) Poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes vigentes, a través de una estructura de adjudicación adminis- *705 trativa con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder los remedios aptos conforme a derecho, disponiéndose que las facultades conferi-das en este inciso podrá delegarlas el Secretario en aquel fun-cionario que él entienda cualificado para ejercer dichas funciones.
(i) Interponer cualesquiera remedios legales que fueran ne-cesarios para hacer efectivos los propósitos de esta ley y hacer que se cumplan las reglas, reglamentos, órdenes, resoluciones y determinaciones del Departamento. 3 L.P.R.A. sec. 341e(d) y e(i). (Énfasis nuestro.)
Ciertamente, la referencia clara a cualesquiera reme-dios en la ley indica que DACo posee amplios poderes para dictar las acciones correctivas que sean necesarias para cumplir con el mandato de su ley habilitadora, es decir, para proteger a los consumidores. Así lo hemos interpre-tado anteriormente. Véanse, entre otros: Quiñones v. San Rafael Estates, S.E., 143 D.P.R. 756, 765-767 (1997), y Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218, 220 (1974).(1) De esa forma, y contrario a lo que alegaron los recurridos ante el tribunal apelativo, DACo puede or-denar las medidas correctivas, incluyendo las reparacio-nes, la compensación de daños o el cumplimiento específico con los planos aprobados por ARPe, como ocurrió en este caso. Por lo tanto, a este punto podemos concluir que el remedio provisto por el juez administrativo de DACo, en cuanto ordenó que los desarrolladores removieran la termi-nación del estucado y la sustituyeran por el empañetado, *706 so pena de tener que pagar $3,500, está dentro de las am-plias facultades de dicha agencia.
[4] En el marco de esas amplias facultades es que DACo aplica la Ley 130. Ésta creó la Oficina del Oficial de la Construcción para, según expresa su título, “proteger a los compradores de vivienda”. La Exposición de Motivos de la Ley 130 (1967 Leyes de Puerto Rico 424-425) reconoce que en “un mercado de viviendas donde las reglas de oferta y demanda operan libremente ... el ciudadano que anhela vivamente la posesión y disfrute de su propio hogar ... es objeto de prácticas indeseables en el negocio de construcción”. En estas circunstancias, el comprador es el “ente más débil”, lo cual justifica que el Estado le brinde su protección.(2)
De lo anterior surge una clara política pública a favor de los compradores de hogares y la dotación a DACo de am-plias facultades para hacer cumplir esa política. Estamos llamados a interpretar las normas sobre prácticas indesea-bles de construcción según esta clara intención legislativa. El Art. 9 de la Ley 130, supra, enumera estas prácticas e incluye, entre ellas, las siguientes:
(c) Alter[a]r o modificar los planos de una vivienda o modelo aprobado por la Junta de Planificación yo la Administración de Reglamentos y Permisos, disponiéndose que toda solicitud de enmienda a los planos o especificaciones del proyecto radi-cada ante la Junta de Planificación yo la Administración de Reglamentos y Permisos deberá estar precedida de un aviso cursado por el urbanizador o constructor a los optantes yo compradores, mediante correo certificado con acuse de recibo con por lo menos veinte (20) días de antelación a la radicación de las enmiendas allí solicitadas.
Dejar de corregir un defecto de construcción en una vivienda según éste sea definido por el reglamento puesto en vigor por el Oficial de Construcción. 17 L.P.R.A. see. 509.
*707 El Art. 10(b)(5) de la ley, por su parte, regula el contenido de los contratos de opción o de compraventa de viviendas. Entre otras cosas, requiere que el contrato de opción contenga el “derecho del comprador a examinar los planos y las especificaciones de la vivienda, y de visitar e inspeccionar el objeto del contrato, en acuerdo con el vendedor”. 17 L.P.R.A. sec. 510(b)(5). El contrato de compraventa también debe incluir
... [el] derecho [del comprador] a resolver el contrato desde que se puede [sic] establecer que la unidad objeto del contrato, estuviere ésta en proceso de construcción o ya terminada, se aparta en forma sustancial de la especificada en el contrato, en cuyo caso se devolverán íntegramente al comprador los pa-gos que hubiere efectuado bajo el contrato de compraventa. 17 L.P.R.A. sec. 510(c)(4).
Este artículo dispone, además, “que el urbanizador o constructor de la unidad objeto del contrato será responsa-ble de los daños y perjuicios que se causen al comprador por razón de defectos de construcción y por falsa represen-tación sobre la unidad vendida”. 17 L.P.R.A. sec. 510(c)(6). Igualmente establece que será causa para resolución, por el optante o por el comprador, que “éste perciba que la uni-dad que se le está construyendo o haya de entregársele se diferencia en modo sustancial de la propuesta unidad a base de la cual él compró”. 17 L.RR.A. sec. 510(f)(1).
Cuando el optante o comprador de una vivienda detecte que se ha cometido una práctica indeseable, podrá presentar una querella en DACo, tras requerirle previa e infructuosamente al urbanizador o constructor que remedie dicha práctica. 17 L.RR.A. see. 511. Para resolver la querella, DACo podrá emplear todas las facultades y los poderes conferidos por su ley orgánica. Id.
En 1977, DACo adoptó el reglamento para facilitar la administración de la Ley 130 y la ley orgánica del Departamento. Este reglamento contiene esencialmente las mismas disposiciones que la Ley 130. Así, en la Sec. 10 *708 del Reglamento, supra, págs. 14-21, con el acápite de “Prácticas Indeseables”, impone a todo urbanizador o constructor la obligación de informar a los compradores de un proyecto “sobre toda solicitud de cambio de planos o espe-cificaciones que se vaya a someter a la Junta de Planifica-ción y/o ARPE”, en cuanto a “cambios en terminaciones: material de los pisos, terminación de pared y techos”, entre otras cosas. íd., pág. 14. El reglamento requiere que se le conceda a dichos compradores un término no menor de veinte días, antes de que se presente la solicitud de cam-bios, para que expongan sus objeciones ante ARPe.
También constituye una práctica indeseable de la construcción alterar o modificar los planos o las especificaciones de una vivienda o un modelo aprobado por ARPe. Sec. 10(c) del Reglamento, supra. Por último, el reglamento permite al comprador resolver el contrato de compraventa, mediante la debida notificación, cuando “perciba que la unidad que se le está construyendo o haya de entregársele se diferencia en modo sustancial de la especificada en el contrato”. El uso de “materiales de diferente calidad a los especificados en perjuicio del comprador” constituye una diferencia sustancial que permite la resolución del contrato. Sec. 15 del Reglamento, supra, pág. 30. La posibilidad de una resolución no es la única alternativa disponible al comprador, pues el reglamento también dispone que cualquier optante o comprador podrá presentar una querella ante la agencia cuando entienda que el urbanizador o constructor ha incurrido en una práctica indeseable de construcción. Sec. 20 del Reglamento, supra.
Ill
En este caso, los compradores ejercieron su derecho a examinar la casa que habían opcionado. 17 L.P.R.A. see. 510(b)(5). Durante la inspección se percataron de que la construcción se apartaba del plano que habían examinado *709 al firmar el contrato de opción. Específicamente, observa-ron cambios estéticos sustanciales que ARPe no había aprobado. Según la Ley 130 (17 L.P.R.A. see. 511), alerta-ron al desarrollador sobre el desvío en el diseño y le requi-rieron que lo corrigiera. Esto lo hicieron en más de una ocasión, reiterando siempre que el plafón del techo debía empañetarse según lo estipulado en el plano. En respuesta a este requerimiento, los desarrolladores informaron a los compradores que si no estaban de acuerdo con la termina-ción del techo podían “rescindir” el contrato de opción.
Con sus actuaciones, los desarrolladores sugieren que el único efecto de su incumplimiénto con los planos de construcción estipulados es hacer surgir a favor de los optantes un derecho a “rescindir” el acuerdo. Esa, sin embargo, no es la intención de la legislación y reglamentación aplicables. El optante o comprador no está obligado a escoger entre resolver el contrato o aceptar los cambios unilateralmente impuestos por el désarrollador. Por el contrario, la posibilidad de resolver el contrato de opción si se observan cambios sustanciales en el diseño es una potestad que la Ley 130 y el Reglamento conceden a los compradores. 17 L.P.R.A. sec. 510(c)(4). El desarrollador siempre estará sujeto a la obligación de cumplir con lo estipulado.
Además, no podemos pasar por alto que cuando se hicie-ron las alteraciones a la casa de los peticionarios, ARPe no había autorizado la enmienda a los planos. De hecho, la autorización de ARPe se obtuvo después de que los peticio-narios examinaron su propiedad y observaron que el techo era distinto al plano del inmueble opciónado. Peor aún, los cambios fueron autorizados después de la resolución de DACo, lo cual demuestra que hasta ese momento los desa-rrolladores se hallaban en franca violación de ley.
También resulta sorprendente que la solicitud de cambios nunca fue notificada a los peticionarios, violando así el mandato de la Ley 130 y del Reglamento sobre Cons- *710 tracción de Viviendas Privadas, que exigen que cualquier solicitud de enmienda a los planos de ARPe se notifique a los optantes por lo menos veinte días antes de presentarlos a la agencia. Las actuaciones de los desarrolladores priva-ron a los peticionarios de la oportunidad de exponer sus objeciones, antes de que se presentaran las modificaciones y, peor aún, no les permitió acudir a ARPe para oponerse a las alteraciones propuestas por el desarrollador.
En resumen, las actuaciones de los desarrolladores constituyeron violaciones evidentes a la Ley 130 y al Re-glamento y eran, por lo tanto, prácticas indeseables en el negocio de la construcción. Los recurridos no han podido presentar ningún argumento jurídico que nos lleve a con-cluir que sus actuaciones eran lícitas o aceptables. Los he-chos hasta aquí analizados confirman la sabiduría del le-gislador que hace casi cuatro décadas estableció una política protectora de los compradores de viviendas y de-muestran por qué la propia Ley 130 llama a éstos “el ente más débil” en la relación contractual y los considera mere-cedores de protección especial.
IV
No obstante, los recurridos argumentan que tras la firma del contrato de compraventa los peticionarios renun-ciaron a su reclamación ante DACo y, por lo tanto, se alla-naron a las prácticas indeseables relatadas. Afirman eso en virtud de que la séptima cláusula de la escritura de compraventa expresa, en esencia, que los compradores ins-peccionaron la propiedad y la aceptan “como está sin re-clamo o reserva de clase alguna”. El tribunal apelativo adoptó dicha interpretación.
No hay duda de que la escritura de compraventa constituye la expresión de la voluntad contractual de las partes. Para su interpretación, nuestro Código Civil prescribe un sistema subjetivista, en el cual lo esencial es es- *711 cudriñar la verdadera intención de los contratantes al mo-mento cuando se concretó el acuerdo. El criterio rector lo encontramos en el Art. 1233 del Código Civil, 31 L.P.R.A. see. 3471:
Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.
Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas. (Enfasis nuestro.)
Este mandato sobre la interpretación contractual debe verse en conjunto con el Art. 1234, según el cual, “para juzgar [la] intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato”. 31 L.P.R.A. see. 3472. Hemos resuelto que también deberán tomarse en cuenta los actos anteriores a la contratación, así como todas aquellas circunstancias que puedan indicar la voluntad de las partes. Véanse, entre otros: García López v. Méndez García, 102 D.P.R. 383 (1983); Coop. La Sagrada Familia v. Castillo, 107 D.P.R. 405 (1978); Merle v. West Bend Co., 97 D.P.R. 403 (1969).(3)
En este caso resulta pertinente la doctrina sobre la interpretación de los contratos llamados “de adhesión”. Estos son los contratos en cuya redacción no interviene una de las partes y en los que el desequilibrio de poder entre las partes impide un verdadero proceso previo de negociación. Véase J.R. Vélez Torres, Curso de derecho civil: derecho de contratos, San Juan, Rev. Jur. U.I.A., 1990, pág. 7. Según explicamos en Zequeira v. CRUV, 83 D.P.R. 878, 881 (1961), “el contrato de adhesión presenta el fenó-meno de una reducción al mínimo de la bilateralidad *712 contractual”. Tratándose de una categoría de contrato “que no consiente la deliberación previa, y, por tanto, es rígida-mente uniforme”,(4) la realidad del consumidor queda ce-ñida a decidir entre aceptar en su totalidad el esquema unilateralmente estructurado por el predisponente o reti-rarse del negocio.
El contrato de adhesión es característico de las situaciones de contratación en masa. Por lo general, el desarrollador o empresario aprovecha la oportunidad de predisponer el contenido del contrato, para incorporar cláusulas que lo exoneran de responsabilidad o limitan las consecuencias de ésta. El uso abusivo de estas cláusulas limitativas de responsabilidad en la práctica de los negocios ha forzado a los tribunales a recurrir a los principios generales del derecho para restringir su eficacia. M. García Amigo, Cláusulas limitativas de la responsabilidad contractual, Madrid, Ed. Tecnos, 1965, pág. 157. Adquieren vigencia interpretativa el principio de la buena fe, los principios de conmutatividad del comercio jurídico y las interpretaciones a partir del interés colectivo. L. Diez-Picazo y Ponce de León, Fundamentos del Derecho Civil patrimonial, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 224. Desde esta perspectiva, cuando se trate de negocios imbuidos de interés público, como sucede en este caso, “[l]a moderación de los abusos que pueden cometerse en la contratación por adhesión ha de llevarse a cabo por vía jurisprudencial”. Id.
Ante esas circunstancias, la doctrina y nuestra jurisprudencia están contestes en que la interpretación de los contratos de adhesión debe favorecer a la parte más débil económicamente y a la que poco o nada tuvo que ver con su redacción. El propósito, según hemos expresado en reiteradas ocasiones, es “promover, hasta donde ello sea posible, la igualdad jurídica en materia de contratación”. *713 Santiago v. Kodak Caribbean, Ltd., 129 D.P.R. 763, 776 (1992); Herrera v. First National City Bank, 103 D.P.R. 724, 727 (1975).(5)
Es harto conocido que tanto los desarrolladores como la banca comercial son los entes fuertes que controlan la redacción de los contratos de compraventa entre los contratistas o desarrolladores y los compradores privados. Esa es la razón de ser de la Ley 130. En ese sentido y de acuerdo con el claro mandato de la ley, resulta esencial que estos contratos sean interpretados, en la forma más beneficiosa para la parte más débil, los compradores de viviendas. Resulta particularmente imperativo hacerlo así cuando las acciones anteriores, coetáneas y posteriores de los compradores contradicen la letra de alguna cláusula del acuerdo.
V
A la luz del Derecho expuesto, atendamos los hechos particulares del caso. Advertimos, en primer lugar, que la naturaleza del contrato de compraventa impedía que los compradores pudieran cambiar su contenido o expresar de forma específica su criterio. El contrato de compraventa suscrito entre Sabanera Real y los peticionarios tiene las características típicas de un contrato de adhesión. Está re-dactado en términos más bien genéricos y estandarizados, y no surge de los autos que hubiera una discusión previa entre las partes sobre su contenido. Por su parte, la cláu-sula de aceptación “sin reservas” también está redactada en términos extremadamente generales. No hay duda de *714 que se trata de la típica cláusula limitativa de responsabi-lidad que requiere una interpretación restrictiva y cuidadosa. No hay en esta cláusula referencia alguna a la reclamación de los compradores sobre la terminación del techo ni sobre el procedimiento instado ante DACo. Ello confirma que no fue producto de un proceso de deliberación entre las partes.
Los compradores, aquí peticionarios, expresaron clara y reiteradamente su criterio contrario a los cambios en la terminación del plafón de la vivienda que habían opcionado. Mediante la carta de 12 de noviembre de 2001 indicaron su descontento con los cambios y el 26 de no-viembre reiteraron su reclamo. Finalmente, poco antes de que se firmara la escritura de compraventa, se comunica-ron con los abogados de los desarrolladores y les señalaron, sin lugar a equívocos, que no deseaban resolver el contrato de compraventa: “no es nuestro interés rescindir del con-trato de compraventa ... por el contrario queremos seguir con el contrato de compra de la unidad A-ll”. Carta de 29 de enero de 2002, Apéndice de la Petición de certiorari, pág. 157.
De esa forma, los peticionarios expresaron su intención contundente de comprar la propiedad y al mismo tiempo continuar con la reclamación que habían presentado ante DACo. Se trata de un curso de acción coherente y con pro-pósitos que no son contradictorios. Los peticionarios que-rían comprar la propiedad y, a la vez, exigir que ésta cum-pliera con lo acordado y aprobado por ARPe. Resulta ineludible concluir que los peticionarios no tuvieron nunca la intención de renunciar a su reclamación ante la agencia administrativa.
Los recurridos argumentan que los peticionarios firma-ron el contrato con pleno conocimiento de las alteraciones a las especificaciones de la propiedad vendida y que, por ello, aceptaron dichas alteraciones. Aducen que la cláusula general de reserva constituye lo que en inglés se denomina *715 una cláusula “as is” y que ésta, de por sí, los exime de responsabilidad. No nos persuaden.(6) La interpretación restrictiva que nos impone la doctrina y la jurisprudencia nos lleva a concluir todo lo contrario. No podemos penali-zar a los peticionarios porque fueron diligentes y ejercieron el derecho que les otorga la Ley 130 a inspeccionar la pro-piedad opcionada. Tampoco podemos castigarlos por su diligencia en reclamar sus derechos ante la compañía que desarrolló el proyecto y ante la agencia encargada de re-glamentar estos negocios. Lo que esto indica es que los vendedores conocían a plenitud tanto la reclamación de los peticionarios como su intención de continuar con la compra de la vivienda opcionada.
En conclusión, resolvemos que al firmar la escritura de compraventa preparada y redactada por el vendedor, los compradores no renunciaron a su reclamación ante DACo, aunque dicho documento contuviera una cláusula de aceptación sin reservas que no fue negociada por ellos. Por consiguiente, la firma de esa escritura no liberó a los desarrolladores de sus responsabilidades estatutarias y DACo actuó correctamente al ordenarles cumplir con las especificaciones de los planos de ARPe, vigentes al momento de la reclamación.
Por los fundamentos antes expuestos se revoca la reso-lución del Tribunal de Apelaciones y se devuelve el caso a *716 DACo para que continúe con los procedimientos de forma compatible con nuestra decisión.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez concu-rrió sin opinión escrita.

 Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218, 220 (1974), trataba sobre una querella, a raíz de la cual ASERCO, agencia predecesora del Departa-mento de Asuntos del Consumidor (DACo), concluyó que un contratista había incum-plido el contrato de construcción y le ordenó reparar las filtraciones y otras imper-fecciones del inmueble o entregarle a la querellante $1,806.75, cantidad representativa del costó de las reparaciones. El contratista no acató la resolución del Director de ASERCO, quien recurrió al Tribunal Superior. Dicho foro resolvió que ASERCO no tenía la facultad para adjudicar derechos antes.de la vigencia del Art. 6(g) de la Ley Orgánica del Departamento de Asuntos del Consumidor, 3 L.P.R.A. see. 341e(g), que otorgaba la facultad a la agencia para resolver y adjudicar querellas presentadas por consumidores. Revocamos y establecimos específicamente que ASERCO siempre tuvo poder para dictar órdenes correctivas y que tal poder podía ejercerse hoy día por DACo.

 Todas las facultades y los poderes de la Oficina del Oficial de la Construcción fueron transferidas a DACo mediante la Ley Núm. 160 de 9 de junio de 1976 (17 L.P.R.A. sees. 502, 504, 507-511, 513-514 y 518).

 En Merle v. West Bend. Co., 97 D.P.R. 403, 409-410 (1969), explicamos lo siguiente: “La intención de las partes es el criterio fundamental dispuesto en el Código Civil para fijar el alcance de las obligaciones contractuales. Es tan fundamental este criterio ... que el Código proclama su supremacía al disponer que la intención evidente de las partes prevalecerá sobre las palabras, a[u]n cuando éstas parecieren contrarias a ellas”.

 R.A; Stiglitz y G.A. Stiglitz, Contratos por adhesión, cláusulas abusivas y protección al consumidor, Buenos Aires, Ed. Depalma, 1985, pág. .51.

 Hemos interpretado las cláusulas del contrato de adhesión aplicando el Art. 1240 del Código Civil, 31 L.P.R.A. see. 3478: “La interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad.” Sin embargo, si lo pactado resulta claro y no viola la ley o contraviene el interés público, prevalecerá el contrato, aun cuando el contrato sea de adhesión. Casanova v. P.R.-Amer. Ins. Co., 106 D.P.R. 689 (1978); Rivera v. Insurance Co. of P.R., 103 D.P.R. 91 (1974).

 En Estados Unidos la mayoría de los tribunales han resuelto que para que la llamada cláusula “as is” sea válida, debe haberse negociado de forma específica: “Courts should begin with a rebuttable presumption that such clauses were not actually understood or agreed to by the purchasers. This presumption comports more closely with the practical realities experienced by purchasers, who often give little attention to such provisions.” C.W. Dallon, Theories of Real Estate Broker Liability and the Effect of the “As Is” Clause, 54 Fla. L. Rev. 395, 445 (2002). Este autor recalca que los tribunales no deben, de ordinario, otorgar validez a las cláusulas del relevo de responsabilidad redactadas en términos generales: “Courts should give careful consideration to the specificity of the clause and be particularly scrutinizing of boiler-plate, one-size-fits-all provisions stating that the purchaser buys the property ‘as is’ or that the purchaser has not relied upon any representations made by seller’s agents. Although the generality of a provision need not be fatal to enforcement of a provision, a provision that is specific to the particular facts of a sale is more likely to be the product of deliberation or consideration than the standard, one-size-fits-all provision, included routinely in contracts.” Id., pág. 447.