

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Heidi M. Acevedo Mangual Daniel Francis Ayala y la Sociedad de Bienes Gananciales Por ellos constituida      Demandantes-Peticionarios  v.  SIMED como aseguradora del Dr. Edgardo Colón Ledeé      Demandada-Recurrida  Dr. Edgardo Colon Ledeé Hospital Mimiya, Inc., SIMED        Demandandos | Certiorari  2009 TSPR 122  176 DPR ____ |

Número del Caso: CC-2005-0042

Fecha: 14 de julio de 2009

Tribunal de Apelaciones:

        Región Judicial de San Juan Panel I

Juez Ponente:

        Hon. Carlos J. López Feliciano

Abogada de la Parte Peticionaria:

        Lcda. Fabiola Fernández Chaves

Abogada de la Parte Recurrida:
        Lcda. Cristina B. Martínez Guzmán

Materia: Seguros-Interpretación de Contrato de Segu    ro de responsabilidad médico hospitalaria.

Este documento constituye un documento oficial del    Tribunal Supremo que está sujeto a los cambios y correccione    s del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónic    a se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Heidi M. Acevedo Mangual
Daniel Francis Ayala y la
Sociedad de Bienes Gananciales
por ellos constituida
    Demandantes-Peticionarios

                v.

                                        CC-2005-42      Certiorari

SIMED como aseguradora del
Dr. Edgardo Colón Ledeé
    Demandada-Recurrida

Dr. Edgardo Colón Ledeé,
Hospital Mimiya, Inc., SIMED
    Demandados


    Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff
    Caraballo


        San Juan, Puerto Rico, a 14 de julio de 2009.


        Nos corresponde pautar si un contrato de venta al por menor a plazos en su modalidad de contrato de financiamiento de primas de seguro, que fue suscrito por las partes contratantes y la compañía aseguradora, pero que no se hizo formar parte de la póliza de seguro, puede modificar los términos de ésta.

**I**

        El 30 de noviembre de 2000, el Sindicato de Aseguradores para la Suscripción Conjunta del Seguro de Responsabilidad Profesional Médico-Hospitalaria (SIMED) expidió una póliza de seguro de responsabilidad médico-hospitalaria a favor del

doctor Edgardo Colón Ledeé, especialista en cirugía plástica y reconstructiva. La póliza, del tipo "claims made", cubría el periodo comprendido entre el 26 de enero de 2001 al 26 de enero de 2002, con fecha retroactiva al 26 de enero de 1998.[1]

La cubierta de la póliza no se extendía a todas las reclamaciones instadas en contra de Colón Ledeé, sino que entre los términos y condiciones del contrato se establecían ciertas exclusiones. Así, SIMED no respondería por aquellas reclamaciones que se generasen de actos u omisiones del galeno ocurridas previo al 26 de enero de 1998 o con posterioridad a la terminación del contrato, ni que se hayan instado en contra de éste previo al 26 de enero de 2001 o con posterioridad a la terminación del contrato.

Ahora bien, en cuanto a las reclamaciones generadas por actuaciones u omisiones de Colón Ledeé ocurridas con posterioridad al 26 de enero de 1998, pero instadas luego de la terminación del contrato, las cuales de ordinario no

---

[1] El término "póliza" "[s]e refiere al contrato por escrito mediante el cual una parte, el asegurador, se compromete, a cambio del pago de una prima, a indemnizar a un tercero, por lo general al asegurado o un reclamante, por una pérdida contingente al ocurrir un evento futuro incierto previsto". R. Cruz, Derecho de Seguros, San Juan, Publicaciones JTS, 1999, págs. 386-387. La póliza del tipo "claims made", conocida en castellano como de "reclamaciones hechas" o de "descubrimiento" (*discovery policy*), ofrece protección al asegurado sólo en contra de las reclamaciones hechas y traídas a la atención de la aseguradora durante su periodo de vigencia, por lo que la notificación de la reclamación a la aseguradora es lo que constituye el evento y el riesgo asegurado, independientemente de la fecha en que ocurrió el siniestro. Torres v. E.L.A., 130 D.P.R. 640, 645-647 (1992); Cruz, op cit., pág. 338. "Así pues, la cubierta bajo un póliza de tipo 'claims-made' depende de que se presente la notificación a la aseguradora dentro del término de vigencia de la póliza o **dentro de cualquier otro término que puedan haber convenido las partes después de la expiración de la misma.**" Torres v. E.L.A., *supra*, págs. 646-647 (1992) (énfasis suplido) (escolio omitido).

estarían cubiertas, la cláusula número IX de la póliza establecía una extensión automática del periodo de cubierta. La referida cláusula le proveía a Colón Ledeé un periodo de cubierta adicional de 60 días para notificar a SIMED sobre las reclamaciones instadas en su contra. Este periodo de 60 días comenzaba a transcurrir a partir de hacerse efectiva la terminación o cancelación de la póliza. Se dispuso, además, que esta extensión automática procedía tanto si la póliza era cancelada por la aseguradora, como si lo era a petición del asegurado, por cualquier razón que no fuese la falta de pago de las primas por parte del asegurado.[2] **Por lo tanto, la única**

---

[2] La aludida cláusula número IX expresamente establecía:

> IX. AUTOMATIC EXTENDED REPORTING PERIOD
>
> Notwithstanding the provisions of the preceding Section I, the period for reporting claims or suits shall be automatically (and without the payment of any additional premiums) extended for a period of sixty (60) days if the insurance provided by this policy is terminated by either the Syndicate or the Insured, for whatever reason, except for the Insured´s nonpayment of premiums. The Automatic Extended Reporting Period shall only apply to claims first made against the Insured during the sixty (60) days following immediately upon the effective date of such termination, but only by reason of claims because of injury to which this policy applies, arising out of the rendering of or failure to render professional services by the Insured on or after the retroactive date of this policy and prior to the effective date of such termination, and subject otherwise to all of the terms, exclusions and conditions of this policy. However, this Automatic Extended Reporting Period may be of unlimited duration under the following circumstances: a) if the Insured retires permanently from the practice of medicine after attaining the age of sixty (60) years; b) the named insured has been insured by the Syndicate for at least five (5) consecutive years immediately prior to such termination; and c) the Insured has not been involved in any claim or suit during the period insured by the Syndicate. There shall be no separate aggregate limits of liability for this Automatic Extended Reporting Period, and it shall be subject to the remaining aggregate limit of liability, if any of this policy. The Automatic Extended Reporting Period does not apply to claims first made against the Insured that are covered under any subsequent insurance or any other extended reporting period coverage the Insured purchased, or that would otherwise be

**situación que permitía que SIMED negara cubierta a favor de Colón Ledeé en esos 60 días era si la cancelación del contrato se debía a la falta de pago de las primas.**

Así lo convenido, Colón Ledeé financió con BT Finance (BTF), una subsidiaria del Bank & Trust of Puerto Rico, el pago de la prima correspondiente a la póliza mediante un contrato de venta al por menor a plazos, en su modalidad de contrato de financiamiento de primas de seguro.[3] Como la prima total pactada en la póliza fue de $21,948.00, Colón Ledeé pagó un pronto de $6,584.00 y BTF pagó directamente a SIMED la diferencia de $15,364.00, siendo

---

covered under said coverages, but for exhaustion of the amount of insurance applicable to such claim.

[3] El contrato de venta al por menor a plazos está definido en la Ley de ventas a plazos y compañías de financiamiento, Ley Núm. 64 de 19 de junio de 1964, 10 L.P.R.A. sec. 731 *et seq*., en los siguientes términos:

> Significa cualquier acuerdo convenido en Puerto Rico para pagar el precio de venta al por menor a plazos de mercancía o servicios en el transcurso de un periodo determinado de tiempo. Además, incluye los certificados de mercancía y certificados de crédito, así como cualquier acuerdo convenido en Puerto Rico en virtud del cual el comprador prometa pagar a plazos el precio de venta diferido de mercancía o servicios, o cualquier parte del mismo o cualquier otro acuerdo convenido en Puerto Rico en virtud del cual el comprador prometa pagar a plazos el balance descubierto de su deuda con un vendedor al por menor y bajo los cuales los cargos a plazos se debitan al balance descubierto por la deuda. El término incluye exclusivamente acuerdos convenidos para pagar el precio de venta al por menor a plazos de mercancía o servicios donde el comprador sea un individuo y medie un cargo por financiamiento.

10 L.P.R.A. sec. 731(6).

Por otro lado, la Ley de ventas a plazos y compañías de financiamiento, *supra*, define el término "compañía de financiamiento" de la siguiente manera:

> Significa una persona que se dedique total o parcialmente, directa o indirectamente, al negocio de comprar o de otra manera adquirir contratos de ventas al por menor a plazos o intereses sobre los mismos, otorgados por otras personas. Este término incluye las personas que se dedican al negocio de financiar primas de póliza de seguro. . . .

10 L.P.R.A. sec. 731(15).

ésta la cantidad finalmente financiada. De esta forma, SIMED recibió el pago total de la prima y BTF quedó designado como cesionario de Colón Ledeé. Así, BTF tenía la facultad para, entre otras cosas, ordenarle a SIMED la cancelación de la póliza en caso de que el doctor dejare de pagar cualquier mensualidad a la que estaba obligado en virtud del contrato de venta al por menor a plazos.[4]

Además, el galeno pactó con BTF que la póliza serviría de garantía del cumplimento con los términos del financiamiento, toda vez que éste cedía a BTF todas las sumas y los pagos que le adviniesen pagaderos en relación con la póliza, su cancelación o cualquier reembolso de primas no devengadas.[5] SIMED, quien consta como parte suscribiente del contrato de venta al por menor a plazos, consintió a la cesión. **Sin embargo, este contrato no se hizo formar parte de la póliza de seguro.**

---

[4] Sobre el particular, es menester puntualizar que hemos establecido que cuando una compañía financiera solicita la cancelación de una póliza debido a la falta de pagos por parte del asegurado, ello debe entenderse como una cancelación realizada a solicitud del asegurado y, como tal, adviene efectiva de manera inmediata, esto es, sin necesidad de esperar a que la aseguradora devuelva las primas no devengadas. Reyes Ayala v. Torres Amaral *et al.*, 130 D.P.R. 743, 748 (1992). En cambio, cuando dicha cancelación se debe a una actuación unilateral de la aseguradora, la cubierta de la póliza se mantendrá vigente hasta que la aseguradora devuelva las primas no devengadas, momento en el cual adviene efectiva la cancelación. Casanova v. P.R.-Amer. Ins. Co., 106 D.P.R. 689, 695 (1978).

[5] Específicamente, la cláusula número 4 del contrato de venta al por menor a plazos disponía:

> En garantía de la obligación del Comprador evidenciada por este documento, el Comprador cede y transfiere a BT FINANCE la póliza y todos los derechos del Comprador bajo la misma, incluyendo, sin estar limitado a, todas las sumas y pagos que sean o advengan pagaderos al Comprador en relación con la Póliza, su cancelación, cualquier reembolso por primas no devengadas resultantes de cualquier cancelación o por cambios que surjan en las pólizas que conllevan primas a devolver. . . .

El 8 de agosto de 2001, tras no recibir el pago mensual correspondiente de parte del doctor Colón Ledeé, BTF ordenó a SIMED que cancelara la póliza. Mediante la comunicación escrita a esos efectos, BTF expuso que ello se debía a atrasos en los pagos del financiamiento, entiéndase, fundamentó su petición en el incumplimiento con los términos del contrato de venta al por menor a plazos.[6] Como consecuencia, el 10 de agosto de 2001 SIMED informó a Colón Ledeé sobre la cancelación de su póliza, efectiva el **20 de agosto de 2001**. En el documento mediante el cual SIMED le notificó la cancelación de su póliza al galeno, se consignó que el motivo por el cual ésta se cancelaba era debido a la petición de BTF a esos efectos.[7]

Así las cosas, en una fecha anterior al 16 de octubre de 2001 –no surge claramente del expediente de autos la fecha exacta– Colón Ledeé solicitó la reinstalación de la póliza, a lo que SIMED le requirió que sometiera un documento intitulado "Insured´s Statement of Representation and Acceptance".[8] El documento no fue devuelto con la firma de Colón Ledeé, sino que, el **16 de octubre de 2001**, el galeno le envió a SIMED una misiva en la que adujo que el atraso en los pagos a BTF se había resuelto. Manifestó que no emitió el pago correspondiente

---

[6] BTF fundamentó su solicitud de cancelación de la póliza en los siguientes términos: "The loan granted for the insurance policies financing is in arrears. We have request[ed] the cancellation p[u]rsuant to loan terms and conditions".

[7] En específico, SIMED expuso: "Reason(s) for the Cancellation is (are): REQUESTED BY FINANCE COMPANY".

[8] Este documento requería una declaración del doctor Colón Ledeé a los efectos de que no se había presentado ninguna reclamación en su contra durante el periodo de la cancelación.

al financiamiento debido a que había estado fuera de Puerto Rico por más de un mes. Luego de saldar la deuda atrasada, y a pesar de la cancelación de la póliza, Colón Ledeé continuó efectuando pagos a favor de BTF por concepto de las mensualidades correspondientes al financiamiento. Sin embargo, el **23 de octubre de 2001**, SIMED le notificó al doctor Colón Ledeé que no le reinstalaría la póliza. Además, el 10 de diciembre de 2001, SIMED le envió a BTF un cheque por la suma de $9,560.00.[9] La razón aducida para la emisión de ese cheque fue que se otorgaba en concepto de la prima no devengada con posterioridad a la efectividad de la cancelación.[10]

Ahora bien, la controversia que nos ocupa surge cuando, el **18 de octubre de 2001**, esto es, entre la solicitud de reinstalación hecha por Colón Ledeé y la consiguiente denegación de SIMED, el doctor le notificó a SIMED de la demanda sobre daños y perjuicios por alegada impericia médica presentada por los aquí peticionarios, Heidi M. Acevedo Mangual, Daniel Francis Ayala y la

_____

[9] A pesar de que el referido cheque está fechado de 25 de septiembre de 2001, del expediente se desprende que SIMED se lo envió a BTF el 10 de diciembre de ese año y que éste lo recibió el siguiente 14 de diciembre. Además, se desprende que fue el mismo 10 de diciembre de 2001 que se le notificó a Colón Ledeé que la suma de $9,560.00 había sido entregada a BTF a tenor con la cesión pactada entre las partes. Incluso, este cheque aparece como cobrado el 24 de enero de 2002.

[10] El concepto de primas no devengadas se refiere a aquellas primas que tienen que ser devueltas al asegurado como consecuencia de la cancelación de una póliza pagada antes de su vencimiento. Véase, Cruz, op cit., pág. 365 (definiendo el término "devolución de primas"). Al contrario, el término "prima devengada" se define como la "[p]orción de prima correspondiente al período estricto de seguro transcurrido durante el ejercicio en que se ha asumido la cobertura del riesgo". J. Castelo Matrán, Diccionario MAPFRE de seguros, Madrid, 1988, pág. 211. A modo de ejemplo, si una póliza se suscribe con carácter anual un 10 de enero de determinado año, para el 30 de junio de ese mismo año, la prima devengada será el 50% de la que hubiese correspondido a la anualidad completa. Íd.

Sociedad de Bienes Gananciales por ellos constituida, en contra de él y de SIMED como su aseguradora, entre otros.[11]

La acción civil se presentó en el Tribunal de Primera Instancia el 27 de septiembre de 2001 y se emplazó a Colón Ledeé el 18 de octubre del mismo año, fecha en la que, como ya señalamos, el galeno procedió a notificar inmediatamente la reclamación a SIMED.

Trabadas las alegaciones entre las partes, el 20 de diciembre de 2002 SIMED le solicitó al foro primario que dictara sentencia sumaria a su favor y, en consecuencia, desestimara la demanda en su contra. Adujo que procedía dictar sentencia sumaria toda vez que no estaba en controversia que para la fecha en que se presentó la reclamación de epígrafe, Colón Ledeé no era asegurado de SIMED ya que desde el 20 de agosto de 2001 la póliza estaba cancelada.

Oportunamente, los peticionarios presentaron su oposición a que se dictara sentencia sumaria. Argumentaron, entre otras cosas, que la póliza se canceló el 20 de agosto de 2001 **por falta de pago a BTF**, por lo que, para el 18 de octubre de 2001, fecha en que se emplazó a Colón Ledeé y se le notificó a SIMED, el doctor sí estaba asegurado de acuerdo con la cláusula IX de la

---

[11] En esencia, los peticionarios alegaron en su demanda que el 3 de octubre de 2000 el doctor Colón Ledeé le realizó a Acevedo Mangual una abdominoplastía y que, como consecuencia de las actuaciones negligentes del médico, ésta sufrió necrosis en el área del abdomen. Así, solicitaron que se responsabilizara solidariamente a los demandados a indemnizarles por los daños y perjuicios sufridos, los cuales estimaron en $2,100,000.00.

póliza. Ello, debido a que dicha cláusula establecía una extensión automática de 60 días para reportar reclamaciones sin necesidad de pago de prima adicional siempre que la cancelación de la póliza se hubiese efectuado por cualquier razón que no fuese la falta de pago de las primas. De tal forma, sostuvieron que como la póliza se satisfizo totalmente en un solo pago, ésta no se canceló por falta de pago de la prima.

Luego de que las partes presentaran ciertos documentos suplementarios concernientes al planteamiento de sentencia sumaria, el 20 de marzo de 2003 el Tribunal de Primera Instancia desestimó con perjuicio la reclamación instada contra SIMED. Determinó que como Colón Ledeé notificó la reclamación a SIMED el 18 de octubre de 2001, a sabiendas de que su póliza se había cancelado desde el 20 de agosto de 2001 por falta de pago, SIMED no era el asegurador del galeno a la fecha en que se presentó la demanda.

Inconformes, los peticionarios acudieron al Tribunal de Apelaciones, el cual confirmó la sentencia apelada. El foro *a quo* concluyó que SIMED no aplicó la aludida extensión automática porque la cancelación de su póliza obedeció a la falta de pago de la prima, lo que constituyó la excepción única para no extender el periodo de cubierta ante reclamaciones como la de autos. Determinó que la cancelación respondió a disposiciones claramente pactadas entre el doctor Colón Ledeé, SIMED y BTF. Así, dispuso que ante la ausencia de una genuina controversia sobre los

hechos esenciales y materiales pertinentes a la cuestión de si Colón Ledeé estaba asegurado por SIMED al momento en que se presentó la reclamación, procedía confirmar la sentencia parcial recurrida.

Insatisfechos con la determinación del Tribunal de Apelaciones, Heidi M. Acevedo Mangual, Daniel Francis Ayala y la Sociedad de Bienes Gananciales por ellos constituida presentaron un recurso de *certiorari* ante este Tribunal. El 15 de abril de 2005 expedimos el auto. Con el beneficio de los alegatos de ambas partes, procedemos a resolver.

## II

En primer lugar, en su alegato los peticionarios señalan que la cancelación de la póliza que aseguraba al doctor Colón Ledeé se debió a la falta de pago de las mensualidades estipuladas en el contrato de venta al por menor a plazos, mediante el cual, a su vez, se financió la prima del contrato de seguro. Por lo tanto, éstos exponen que en realidad nunca hubo tal falta de pago de la prima, como lo sostuvo el foro apelativo intermedio. Siendo así, aducen que la cláusula de extensión automática del término de cubierta se encontraba en pleno vigor, por lo que la reclamación debió haber sido acogida por haberse notificado dentro del periodo de 60 días a partir de la cancelación de la póliza.

De esta forma, concluyen que Colón Ledeé era un asegurado de SIMED toda vez que la única excepción para no proveer cubierta en dicho periodo era que la cancelación

se debiera a la falta de pago de las primas y no a la falta de pago del financiamiento. Sobre este particular, resalta el hecho de que la prima se había pagado en su totalidad con anterioridad a que se originara la controversia de autos.

En segundo lugar, los peticionarios argumentan que el convenio con la compañía de financiamiento de modo alguno pudo modificar o alterar el contrato de seguro ya que, al no haberse hecho formar parte de éste, no se cumplió con lo dispuesto en el Art. 11.180 del Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, 26 L.P.R.A. sec. 1118.

Por su parte, SIMED plantea que el contrato de venta al por menor a plazos suscrito con BTF gravó la prima pagada a SIMED como garantía del cumplimento del asegurado con los términos del financiamiento, ya que en éste se dispuso que Colón Ledeé cedía a BTF todas las sumas y los pagos que le adviniesen pagaderos en relación con la póliza, su cancelación o cualquier reembolso por primas no devengadas. En virtud de esa garantía, aduce que cualquier notificación por falta de pago del financiamiento se debe considerar como una cancelación por falta de pago de la prima.

Más aún, sostiene que por mediar un contrato de venta al por menor a plazos como mecanismo de pago de la prima, resultaría antijurídico no equiparar la falta de pago del financiamiento a la falta de pago de la prima. De esta forma, concluye que se constituyó una cancelación por

falta de pago de la prima bajo los términos del contrato de seguro, cuestión que impide la aplicación de la extensión del término de cubierta de 60 días, por lo que a la fecha de recibo de la reclamación, SIMED no tenía expedida póliza alguna a favor del galeno.

Así las posiciones encontradas, analicemos las características principales del contrato de seguro y la forma adecuada de modificarlo o alterarlo.

## III

Las compañías aseguradoras constituyen la institución por excelencia para la protección de las necesidades y consecuencias dañosas de los riesgos que amenazan al hombre en su vida o patrimonio.[12] El alto interés público del que está revestido el negocio de los seguros se desprende de la extraordinaria importancia y el papel evidentemente social del que participa.[13] De ahí que el Estado se haya encargado de regularlo ampliamente, en principio, mediante el Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, 26 L.P.R.A. sec. 101 *et seq.*, rigiendo las disposiciones de nuestro Código Civil de manera supletoria.[14]

Un contrato de seguro es un acuerdo mediante el cual una persona se obliga a indemnizar a otra, o a proveerle un beneficio específico o determinable, ante la ocurrencia

---

[12] L. Benítez de Lugo y Reymundo, El Riesgo Jurídico, Madrid, 1961, pág. 17.

[13] Véase, Echandi Otero v. Stewart Title, 174 D.P.R. ___ (2008), 2008 T.S.P.R. 126, 2008 J.T.S. 146, 1581.

[14] López v. Atlantic Southern Ins. Co., 158 D.P.R. 562, 569 (2003).

de un suceso incierto pero previsto en el contrato.[15] El asegurador asume unos riesgos a cambio de una prima, de lo que surge una obligación por parte de éste de responder por la carga económica que recaiga sobre el asegurado en caso de ocurrir el evento especificado en el contrato.[16] Así, el propósito de todo contrato de seguro es la indemnización y la protección en caso de producirse el suceso incierto previsto en éste.[17]

El contrato de seguro contra la responsabilidad profesional médico-hospitalaria tiene como finalidad indemnizar a los galenos y a las instituciones para el cuidado de la salud por las pérdidas pecuniarias en las que éstos incurren al ser responsabilizados por los daños causados a terceros reclamantes, pacientes y familiares, por error, omisión, culpa o negligencia, como consecuencia de, o inherentes a, los servicios profesionales brindados o que debieron haber brindado.[18] En otras palabras, constituye una cubierta de seguro que protege al asegurado, dentro de los límites establecidos en el contrato, contra la responsabilidad legal de éste por los daños o lesiones causadas a terceras personas como

---

[15] 26 L.P.R.A. sec. 102.

[16] Coop. Ahorro y Créd. Oriental v. Oquendo Camacho, 158 D.P.R. 714, 721 (2003).

[17] Echandi Otero v. Stewart Title, *supra*, pág. 1582; Molina v. Plaza Acuática, 166 D.P.R. 260, 267 (2005).

[18] Díaz Ayala *et al*. v. E.L.A., 153 D.P.R. 675, 689-690 (2001); véase, 26 L.P.R.A. sec. 4102(2),(7).

consecuencia del rendimiento negligente de sus servicios profesionales.[19]

Este tipo de contrato, comúnmente conocido como de impericia médica o mala práctica profesional, ha adquirido en los pasados años una gran importancia. Esto, debido a que permite que tanto el paciente como el médico o la institución asegurada puedan sentirse confiados: el paciente, porque sabe que en su día, y en el supuesto de que le asista la razón, será indemnizado por los daños que el médico pueda causarle; y el asegurado, porque sabe que, por su profesión, está verdaderamente expuesto a causar daños a otros cuyas causas de acción agravarían extraordinariamente su patrimonio.[20]

Confirma la importancia que tiene en la vida moderna el seguro de responsabilidad por impericia médica, el hecho de que a los profesionales de la salud se les exige, como condición previa para ejercer la medicina en Puerto Rico, tener que demostrar su responsabilidad financiera para el año fiscal en que ejercerán sus funciones, mediante, entre otras cosas, la obtención de una póliza anual de responsabilidad por impericia médica.[21]

Ahora bien, adquirida una póliza de seguro, en caso de producirse el suceso incierto previsto en ésta, suelen generarse controversias con relación a si los términos en que fue redactada obligan al asegurador a indemnizar al

---

[19] Díaz Ayala *et al*. v. E.L.A., *supra*, pág. 690.

[20] Véase, Benítez de Lugo y Reymundo, op cit., págs. 32-33.

[21] 26 L.P.R.A. sec. 4105.

asegurado o a proveerle el beneficio especificado. Ante esta realidad, es menester tener presente al momento de interpretar tales cláusulas que los contratos de seguro, al igual que todos los contratos, constituyen en estricto derecho la ley entre las partes.[22] Claro está, esto siempre y cuando cumplan con los requisitos de los contratos en general, a saber, consentimiento de los contratantes, objeto cierto y causa de la obligación que se genera.[23]

Anteriormente hemos resuelto que un contrato de seguros es uno de adhesión.[24] Un contrato de adhesión es aquel mediante el cual una sola de las partes dicta las condiciones del contrato, las cuales ha de aceptar la otra parte contratante.[25]

Como contrato de adhesión, el de seguros debe interpretarse liberalmente a favor del asegurado con el objetivo de sostener la cubierta por vía de una interpretación razonable.[26] Esto obedece a que, como los términos de las pólizas de seguro no son el producto de la negociación entre las partes, sino que son prefijados por el asegurador sin que el asegurado tenga la facultad de

---

[22] Art. 1230 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3451; Echandi Otero v. Stewart Title, *supra*, pág. 1581; López v. Atlantic Southern Ins. Co., *supra*, pág. 569.

[23] Art. 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3391; Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 154 (1996).

[24] López v. Atlantic Southern Ins. Co., *supra*, pág. 568, Quiñones López v. Manzano Pozas, *supra*, pág. 155.

[25] Zequeira v. C.R.U.V., 83 D.P.R. 878, 880 (1961).

[26] López v. Atlantic Southern Ins. Co., *supra*, pág. 568, Quiñones López v. Manzano Pozas, *supra*, pág. 155.

variarlos, el asegurador "tiene la obligación de hacer clara su intención; en otras palabras[,] viene obligado a establecer en la póliza, de manera diáfana, los riesgos por los que viene obligado a responder".[27]

No obstante, esta norma no tiene el efecto de obligar a los tribunales a interpretar a favor del asegurado una cláusula que claramente le da la razón al asegurador cuando su significado y alcance sea claro y libre de ambigüedad.[28]

En reiteradas ocasiones hemos sostenido que si los términos, las condiciones y las exclusiones de un contrato de seguro son claros, específicos y libres de ambigüedades, se hará valer la clara voluntad de los contratantes.[29] Los términos de un contrato son claros cuando "por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación".[30] En ausencia de ambigüedad, las cláusulas del contrato son obligatorias

---

[27] Meléndez Piñero v. Levitt & Sons of P.R., 129 D.P.R. 521, 547 (1991).

[28] Quiñones López v. Manzano Pozas, *supra*, pág. 155; A.A.A. v. Librotex Inc., 141 D.P.R. 375, 380-381 (1996).

[29] Echandi Otero v. Stewart Title, *supra*, pág. 1581; Coop. Ahorro y Créd. Oriental v. Oquendo Camacho, *supra*, pág. 724; López v. Atlantic Southern Ins. Co., *supra*, pág. 569.

[30] Sucn. Ramírez v. Tribunal Superior, 81 D.P.R. 357, 361 (1959).

pues no se admitirá una interpretación que vulnere el claro propósito y voluntad de las partes.[31]

En atención a lo anterior, hemos reconocido que los términos de las pólizas de seguro "deben ser generalmente atendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces".[32] Así, se le confiere al asegurado el derecho a confiar en la cubierta que se le ofrece tras una lectura de sus cláusulas conforme al sentido popular de sus palabras.[33] Sin embargo, si de la póliza se desprende un significado particular para determinado término, éste se aplicará a tenor con lo convenido por las partes. Consecuentemente, la labor de los tribunales consiste en buscar el sentido y significado que a las cláusulas contenidas en la póliza le daría una persona de inteligencia promedio que se apreste a adquirirla.[34]

Por otro lado, al determinar cuáles son los riesgos cubiertos por una póliza de seguro, es necesario considerar si en el contrato figura alguna cláusula de exclusión.[35] Debido a que estas cláusulas tienen el propósito de limitar la cubierta establecida en el acuerdo

---

[31] Quiñones López v. Manzano Pozas, *supra*, pág. 156; López v. Atlantic Southern Ins. Co., *supra*, pág. 569.

[32] Morales Garay v. Roldan Coss, 110 D.P.R. 701, 706 (1981).

[33] Echandi Otero v. Stewart Title, *supra*, pág. 1582; Domínguez v. GA Life, 157 D.P.R. 690, 699-700 (2002).

[34] Coop. Ahorro y Créd. Oriental v. Oquendo Camacho, *supra*, pág. 723; Quiñones López v. Manzano Pozas, *supra*, pág. 155.

[35] Monteagudo Pérez v. E.L.A., 172 D.P.R. ___ (2007), 2007 T.S.P.R. 153, 2007 J.T.S. 159, 99.

principal y disponen que el asegurador no responderá por determinados eventos, riesgos o peligros, hemos concluido que éstas han de interpretarse restrictivamente de forma tal que cualquier ambigüedad debe resolverse a favor del asegurado.[36] De esta forma se cumple con el propósito de todo contrato de seguro, esto es, ofrecer la mayor protección a la persona asegurada.[37] No obstante, si una cláusula de exclusión aplica claramente a determinada situación, la aseguradora no está obligada a responder por los riesgos expresamente excluidos.[38]

Ahora bien, la interpretación que de una póliza de seguro se realice tiene que ser cónsona con la norma de hermenéutica que impone el Art. 11.250 del Código de Seguros de Puerto Rico, el cual dispone lo siguiente:

> *Todo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud* **adherido a la póliza y que forme parte de ésta.**[39]

El texto referido establece que la ampliación, extensión o modificación del contrato de seguro se da por aditamento, endoso o solicitud adherida a la póliza para

---

[36] Echandi Otero v. Stewart Title, *supra*, pág. 1582; Monteagudo Pérez v. E.L.A., *supra*, pág. 99; Marín v. American Int´l Ins. Co. of P.R., 137 D.P.R. 356, 362 (1994); véase además, Cruz, op cit., págs. 167-168.

[37] Íd.

[38] Echandi Otero v. Stewart Title, *supra*, pág. 1582; Marín v. American Int´l Ins. Co. of P.R., *supra*, pág. 362.

[39] 26 L.P.R.A. sec. 1125 (énfasis suplido).

formar parte de ésta, y debe interpretarse de manera global a partir del conjunto total de sus términos y condiciones.[40] De lo anterior se desprende que al interpretar una póliza, ello debe realizarse conforme al propósito de ésta, a saber, ofrecer protección al asegurado.[41] Por esto, no se favorecerán interpretaciones sutiles que le permitan al asegurador evadir su responsabilidad.[42]

Además, y como piedra angular a la controversia que nos ocupa, es cardinal también el Art. 11.180 del Código de Seguros de Puerto Rico, el cual en su primer inciso señala que "[l]a póliza deberá contener todo el contrato . . . [ya que **n]ingún convenio que esté en conflicto con el contrato de seguro o que lo enmiende o amplíe será válido a menos que fuere por escrito y se hiciere formar parte de la póliza**".[43] Como puede colegirse de los artículos del Código de Seguros antes citados, **cualquier alteración a la póliza se tiene que adherir y hacer formar parte de ésta.**

Fundamentados en el referido Art. 11.180, hemos establecido que el Código de Seguros "interesa un contrato de seguro completo en sí mismo, que contenga todo lo acordado entre las partes y que sea por escrito".[44] Así,

---

[40] Díaz Ayala *et al*. v. E.L.A., *supra*, pág. 691; Quiñones López v. Manzano Pozas, *supra*, págs. 154-155.

[41] Íd.

[42] Coop. Ahorro y Créd. Oriental v. Oquendo Camacho, *supra*, pág. 723; Quiñones López v. Manzano Pozas, *supra*, pág. 155.

[43] 21 L.P.R.A. sec. 1118(1) (énfasis suplido).

[44] The London Assurance v. Tribunal Superior, 95 D.P.R. 305, 310 (1967).

el contrato de seguro puede ser objeto de todas las alteraciones o modificaciones que se estimen convenientes siempre que las partes consientan y se haga constar expresamente en el contrato o se incorpore a la póliza.[45]

En consecuencia, existen varias alternativas para modificar una póliza de seguro válidamente de manera que las alteraciones que se pretenden surtan efecto jurídico.[46] Para esto, es necesario que éstas se realicen mediante un endoso al margen o al dorso de la póliza, por medio de inserción de palabras en el cuerpo del contrato, por un documento aparte que exponga que se adjunta y se hace formar parte de la póliza, o mediante la redacción de un nuevo contrato que recoja el cambio convenido.[47]

## IV

En el caso de autos, SIMED expidió una póliza de seguro de responsabilidad médico-hospitalaria a favor del doctor Colón Ledeé, la cual cubría el periodo comprendido entre el 26 de enero de 2001 al 26 de enero de 2002, con fecha retroactiva al 26 de enero de 1998. A cambio de la prima, SIMED asumió la obligación de responderle al galeno por cualquier reclamación por mala práctica profesional que se incoara en su contra durante la vigencia del contrato de seguro o dentro del periodo extendido de

---

[45] 2 Appleman on Insurance, 2nd Ed., West Publishing, sec. 8.3 (1996).

[46] No obstante, debe tenerse en cuenta que los requisitos establecidos en el referido Art. 11.180 "no se aplicarán a la concesión de beneficios adicionales a todos los tenedores de pólizas de un asegurado, o a una clase o clase de ellos, que no requieran aumentos en los tipos de primas o reducción o restricciones de cubierta". 21 L.P.R.A. sec. 1118(3).

[47] 2 Couch on Insurance, 3rd Ed., West Group, sec. 25:10 (1997).

cubierta de 60 días provisto en éste. De esta forma, la reclamación de impericia médica presentada por los peticionarios constituye el suceso incierto o el evento específico, y el riesgo asumido por el recurrido, que genera la obligación de indemnizar al doctor Colón Ledeé, como el tenedor de la póliza, por las pérdidas pecuniarias que podría sufrir si en su día se le responsabiliza por los daños causados como consecuencia de las alegadas actuaciones negligentes en la prestación de sus servicios profesionales.

La reclamación se incoó y se le notificó a SIMED con posterioridad a que se cancelara la póliza. En específico, SIMED advino en conocimiento de que se había entablado una reclamación por impericia médica en contra de Colón Ledeé 59 días después de la cancelación del contrato de seguro.[48] Ahora bien, la cláusula número IX de la póliza le proveía al galeno un periodo de cubierta adicional de 60 días a partir de su cancelación para notificar a SIMED reclamaciones instadas en su contra. De esta forma, la aludida cubierta adicional constituye parte integral del riesgo previsto y asumido por SIMED al expedir la póliza. Ésta operaría automáticamente, sin necesidad de pago adicional, siempre que la cancelación del contrato se

---

[48] Téngase en cuenta que como fue BTF quien solicitó la cancelación debido a la falta de pagos por parte de Colón Ledeé, ésta advino efectiva tan pronto fue efectuada, esto es, el 20 de agosto de 2001. Véase, Reyes Ayala v. Torres Amaral et al., supra, pág. 748. En este sentido, como a SIMED se le notificó de la reclamación el 18 de octubre de 2001, un mero cálculo nos lleva a concluir que dicha notificación ocurrió 59 días después de que fue efectiva la cancelación solicitada por BTF. Ello así, debido a que en este caso resulta irrelevante el que las primas no devengadas hayan sido devueltas el 10 de diciembre de 2001. Íd.

debiera a cualquier razón que no fuera la falta de pago de las primas.

La prima de $21,948.00 se pagó en su totalidad al comienzo del periodo de cubierta. El doctor Colón Ledeé pagó a SIMED un pronto de $6,584.00 y BTF pagó directamente a SIMED la diferencia de $15,364.00. De esta forma, BTF quedó constituida como la compañía que financió más de la mitad de la prima mediante un contrato de venta al por menor a plazos. Por medio de este contrato, Colón Ledeé le otorgó a BTF la facultad para ordenarle a SIMED la cancelación de la póliza cuando el galeno dejare de pagar cualquier mensualidad del financiamiento. Además, convino en cederle a BTF, como garantía para asegurar el pago del financiamiento, cualquier suma de dinero que SIMED adviniese obligada a pagarle con relación a la póliza. Ciertamente, todo lo anterior se realizó con el consentimiento expreso de SIMED ya que ésta consta como parte suscribiente en dicho contrato, no obstante, **este convenio escrito no se hizo formar parte de la póliza.**

Como consecuencia de que Colón Ledeé incumplió con el contrato de venta al por menor a plazos al no efectuar uno de los pagos mensuales correspondientes al financiamiento, BTF ejerció su facultad de ordenarle a SIMED la cancelación de la póliza. SIMED notificó al galeno la cancelación de su póliza manifestando que ello se debía a una petición de la compañía financiera a esos efectos. Al respecto, es menester enfatizar que en ninguno de los dos eventos, es decir, ni cuando BTF solicita la cancelación

de la póliza ni cuando SIMED le informa al doctor la efectividad de la cancelación, se aduce como razón para la cancelación la falta de pago de la prima del contrato de seguro, sino que **la cancelación se fundamentó en todo momento como un incumplimiento con los términos del contrato de venta al por menor a plazos**.

Transcurridos 59 días de hacerse efectiva la cancelación, el doctor Colón Ledeé le notificó a SIMED la reclamación de los aquí peticionarios ya que, al ser el término de extensión de cubierta uno de 60 días, Colón Ledeé se consideraba aún un asegurado de SIMED toda vez que la cancelación no se debió a la falta de pago de la prima. Sin embargo, la aseguradora negó la referida cubierta a base de que la notificación por falta de pago del financiamiento constituía una cancelación por falta de pago de la prima, debido a que medió un contrato de venta al por menor a plazos como mecanismo para el pago de la prima.[49]

En primer lugar, no coincidimos con la interpretación que hace SIMED de la cláusula número IX del contrato de

---

[49] Sobre este particular, resalta el hecho de que no existe controversia en torno a que la prima de la póliza se satisfizo en su totalidad al comienzo de las relaciones contractuales entre Colón Ledeé y SIMED. Indistintamente de qué parte de la prima se abonó mediante financiamiento de BTF, ésta se pagó en su totalidad. Más aún, resulta revelador como el propio recurrido le envió un cheque por la cantidad de $9,560.00 en concepto de devolución de la prima no devengada al momento de la cancelación del contrato. Esta devolución se efectuó el 10 de diciembre de 2001, es decir, casi dos meses después de habérsele notificado la reclamación instada por los peticionarios. Debido a que el concepto de primas no devengadas se refiere a aquellas primas que tienen que ser devueltas al asegurado como consecuencia de la cancelación de una póliza pagada antes de su vencimiento, ello impide argumentar con éxito que el motivo por el cual se canceló la prima fue la falta de pago de ésta, pues, incluso, fue como resultado de tal cancelación que procedió la devolución de la prima pagada pero no devengada.

seguro; su lenguaje no lo justifica. Todo lo que se necesita es realizar una lectura de la cláusula en cuestión para concluir que ésta es clara y no impone condiciones más allá de su fiel cumplimiento. La cláusula expresamente dispone que el periodo para reportar reclamaciones o pleitos será extendido automáticamente por 60 días si la póliza es cancelada por cualquier razón que no sea la falta de pago de las primas por parte del asegurado. Cuando dicha cláusula establece la falta de pago de las primas como condición única para no extender el periodo de cubierta a favor del asegurado, **se refiere específicamente a la situación en que se acuerda con el asegurador pagar la prima del seguro a plazos.**[50] No se refiere al incumplimiento del asegurado dentro de una relación paralela con una compañía de financiamiento mediante un contrato de venta al por menor a plazos en el cual se designa al acreedor financiero como cesionario con facultad para ordenar la cancelación de la póliza en caso de la falta de pago de los plazos del financiamiento. Por lo tanto, la cancelación solicitada por BTF no configura el tipo de cancelación excluyente que establece la cláusula número IX, toda vez que la prima a la que ésta hace referencia se pagó en su totalidad al comienzo del periodo de cubierta del seguro.

---

[50] Se le conoce como "prima fraccionada" a "[a]quélla que, aunque calculada en períodos anuales, es liquidada por el asegurado mediante pagos periódicos más reducidos (semanas, meses, trimestres, etc.)". Castelo Matrán, op cit., pág. 211.

Los términos en que está redactada la cláusula en controversia son lo suficientemente lúcidos como para ser entendidos en un mismo sentido, sin dar lugar a dudas ni a diversidad de interpretaciones, lo que nos lleva a hacer valer la clara voluntad de los aquí contratantes. En la medida en que la prima del seguro se pagó en su totalidad, y la exclusión de la cubierta extendida se activa únicamente ante la falta de pago de ésta, es forzoso concluir que SIMED viene obligado a reconocer que Colón Ledeé es su asegurado según el lenguaje utilizado en la propia póliza. De esta forma, nos distanciamos de realizar una interpretación sutil que le permita al asegurador evadir su responsabilidad, a la vez que ejercemos nuestra labor de buscar el sentido que le daría a la cláusula una persona de normal inteligencia que se apreste a comprar una póliza como la de autos.

En segundo lugar, es la contención del recurrido que resultaría antijurídico no equiparar la falta de pago del financiamiento a la falta de pago de la prima ya que el contrato de venta al por menor a plazos gravó la prima pagada a SIMED como garantía del cumplimento del asegurado con los términos del financiamiento. Esto, debido a que mediante dicho contrato, en el que SIMED aparece como suscribiente, Colón Ledeé cedió a BTF todas las sumas y los pagos que le adviniesen pagaderos en relación con la póliza, su cancelación o cualquier reembolso por primas no devengadas. Tampoco le asiste la razón.

El aludido contrato de venta al por menor a plazos no se adhirió ni se hizo formar parte de la póliza, por lo que constituye más bien un convenio separado e independiente del contrato de seguro. En vista de lo anterior, los peticionarios sostienen válidamente que el convenio con la compañía de financiamiento de modo alguno pudo modificar o alterar el contrato de seguro ya que, al no haberse hecho formar parte de éste, no se cumplió con lo dispuesto en el Art. 11.180 del Código de Seguros. Por lo tanto, el asegurador no puede argumentar con éxito que, como los beneficios de la póliza servían de garantía al financiamiento, la falta de pago de éste se equipara a la falta de pago de la prima.

Sabido es que las pólizas de seguro deben interpretarse globalmente a partir del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido o modificado **por aditamento, endoso o solicitud adherida a la póliza para formar parte de ésta**.[51] A tenor con esta norma de hermenéutica, el Art. 11.180 del Código de Seguros "interesa un contrato de seguro **completo en sí mismo**, que **contenga todo lo acordado** entre las partes y que **sea por escrito**".[52] Para que cualquier alteración o modificación a la póliza surta efectos jurídicos dentro de la relación contractual entre el asegurado y el asegurador, resulta

---

[51] 26 L.P.R.A. sec. 1125.

[52] The London Assurance v. Tribunal Superior, *supra*, pág. 310 (énfasis suplido).

indispensable que conste por escrito y se haga formar parte del contrato de seguro, constituyéndose así un convenio que, en sí mismo, integre todo lo acordado entre las partes. Es a partir de que se satisfagan estas exigencias normativas, que los contratantes tendrán que atenerse a los términos de la póliza según enmendada.

En ese sentido, si la enmienda no cumple con lo dispuesto en el estatuto, resultará inmaterial cuál sea o haya sido la intención de las partes, por lo que será la aseguradora quien asumirá las consecuencias de no cumplir con el procedimiento establecido en la ley que regula sus negocios.[53]

Ciertamente, en el presente caso los beneficios de la póliza servían de garantía al pago del financiamiento que se estableció mediante el contrato de venta al por menor a plazos suscrito entre BTF, el doctor Colón Ledeé y SIMED. No obstante, la falta de pago de éste no se puede equiparar a la falta de pago de la prima ya que el contrato de venta al por menor a plazos no se adhirió ni se hizo formar parte de la póliza, como dispone el Art. 11.180 del Código de Seguros.

Además, en el referido contrato nada se dispuso con relación a que la falta de pago del financiamiento debía entenderse como la falta de pago de la prima. Ésta era la única alternativa que tenía SIMED para poder validar su argumento, a saber, que el contrato de venta al por menor

---

[53] 2 Couch on Insurance, *supra*, sec. 25:2; Industrial Indem. Co. v. Aetna Casualty & Surety Co., 465 F. 2d 934, 938 (1972).

a plazos se hizo formar parte de la póliza y que en éste se estableció expresamente que la falta de pago de los plazos del financiamiento se entendería como la falta de pago de la prima. De este modo, la cancelación solicitada por BTF se hubiera podido adjudicar como una situación de falta de pago de la prima del contrato de seguro, única excepción contemplada en la cláusula número IX para excluir la aplicación del periodo de cubierta extendida de 60 días.

Por los fundamentos que anteceden, se revoca la Sentencia emitida por el Tribunal de Apelaciones y se devuelve el presente caso al Tribunal de Primera Instancia para que resuelva conforme con lo aquí expuesto.

Se dictará Sentencia de conformidad.


                                    Erick V. Kolthoff Caraballo
                                          Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Heidi M. Acevedo Mangual
Daniel Francis Ayala y la
Sociedad de Bienes Gananciales
por ellos constituida
   Demandantes-Peticionarios

         v.

                  CC-2005-42     Certiorari

SIMED como aseguradora del
Dr. Edgardo Colón Ledeé
   Demandada-Recurrida

Dr. Edgardo Colón Ledeé,
Hospital Mimiya, Inc., SIMED
   Demandados


SENTENCIA


San Juan, Puerto Rico, a 14 de julio de 2009.

     Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la Sentencia emitida por el Tribunal de Apelaciones y se devuelve el presente caso al Tribunal de Primera Instancia para que resuelva conforme con lo aquí expuesto.

     Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió Opinión de Conformidad a la cual se une la Juez Asociada señora Rodríguez Rodríguez.


                 Aida Ilena Oquendo Graulau
                 Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Heidi M. Acevedo Mangual
Daniel Francis Ayala y la
Sociedad de Bienes Gananciales
Por ellos constituida
   Demandantes-Peticionarios

       v.

                         CC-2005-42       Certiorari

SIMED como aseguradora del
Dr. Edgardo Colón Ledeé
   Demandada-Recurrida

Dr. Edgardo Colon Ledeé
Hospital Mimiya, Inc., SIMED
   Demandandos


Opinión de Conformidad emitida por el Juez Presidente señor Hernández Denton, a la cual se une la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico a 14 de julio de 2009.

Aunque coincidimos con el resultado al que llega el Tribunal en la Opinión que emite hoy en el caso de epígrafe, hemos decidido suscribir esta breve Opinión de Conformidad por entender que es necesario aclarar unos aspectos relacionados con la normativa jurídica aplicable a una cancelación de póliza de seguro a solicitud de la compañía que financió las primas.

I

Los hechos que originan la controversia de autos están debidamente expuestos en la Opinión del Tribunal, por lo que pasaremos directamente a los asuntos de Derecho que nos conciernen. La controversia medular del caso de autos consiste

en determinar el tratamiento que debe dársele a una solicitud de cancelación de una póliza de seguro hecha por BT Finance luego de que el asegurado, el Dr. Edgardo Colón Ledeé, incumpliera con un pago mensual del financiamiento de las primas. En particular, el Tribunal debía resolver si la falta de pago del Dr. Colón Ledeé a BT Finance, como parte del contrato de financiamiento de la póliza, debe ser considerada como una falta con los pagos de las primas para fines de la cláusula IX del contrato de seguro. Dicha cláusula provee una extensión automática del período para notificar una reclamación a la aseguradora durante 60 días a partir de la fecha de terminación o cancelación de la póliza, siempre que dicha cancelación no se deba a la falta de pago de las primas.

Luego de revisar el contrato de financiamiento suscrito por las partes, así como la jurisprudencia y la doctrina aplicable, estamos de acuerdo con la Opinión del Tribunal en que —en las circunstancias particulares de este caso— la falta de pago a la compañía financiera no debe tratarse como falta de pago con las primas de seguro, por lo que procede revocar la Opinión del Tribunal de Apelaciones. La razón para llegar a esa conclusión —según nuestro criterio— es que cuando la financiera es la que le solicita la cancelación de la póliza a la aseguradora, dicha cancelación se debe considerar como una cancelación a solicitud del asegurado. Ello en virtud de la cesión de derechos a favor de la financiera que ocurre en el contrato de financiamiento, el cual —entre otras cosas— concede un

poder de mandato a la financiera para solicitar la cancelación de la póliza. Veamos.

II

Por lo general, en un contrato de financiamiento de pólizas de seguro el asegurado cede a la compañía financiera ciertos derechos que surgen del contrato de seguro, incluyendo el poder para solicitar la cancelación de la póliza a nombre suyo, en caso de éste incumplir con algún pago del financiamiento. 6 Appleman on Insurance, 2d Ed. Lexis Law Publishing, sec. 39:10 (1996). La cesión que hace el asegurado a la financiera, en la mayoría de las ocasiones, incluye el derecho de recobrar las primas de seguro no devengadas y cualquier otro pago que la aseguradora deba hacer a favor del asegurado. De igual forma, la financiera puede recobrar cualquier balance pendiente relacionado al financiamiento de la póliza.

No obstante, en aquellos casos en que el contrato de financiamiento no le otorga a la compañía financiera un poder para tratar la falta de pago del financiamiento por parte del asegurado como una determinación de cancelar la póliza, la compañía financiera no tiene ningún poder para requerir la cancelación. 2 Couch on Insurance, 3rd Ed., West Group, sec. 31:43 (1995). Es por ello que los derechos y las obligaciones de las partes sobre este asunto dependen en gran medida del lenguaje utilizado en el contrato de financiamiento. Al abundar sobre la importancia de los términos del contrato de financiamiento, Couch expresa que

"[A] premium finance company has the right to cancel the insurance policy it has financed **only if the right is contained in the finance agreement.**" Íd, pág. 31-55. (Énfasis nuestro).

De lo anterior se desprende que el contrato de financiamiento de pólizas de seguro, entre otras cosas, traspasa los derechos adquiridos por el asegurado en el contrato de seguro de póliza, pero no los modifica. **Es decir, el contrato de financiamiento, de por sí, no tiene el efecto de modificar el contrato de seguro, sino más bien, se limita a traspasar los derechos del asegurado tal como éstos fueron establecidos en el contrato de seguro.** Además, en cuanto a la compañía aseguradora se refiere, debemos recordar que ésta sólo debe cumplir con sus obligaciones contractuales hasta el momento de la cancelación, la cual, según el Derecho vigente, al ser solicitada por la financiera – y entenderse en dicho caso que es como si la solicitara el asegurado- es inmediata. Ahora bien, es menester resaltar que en Casanova Díaz v. Puerto Rican-American Ins. Co., 106 D.P.R. 689 (1978) resolvimos que cuando la cancelación se debe a una acción unilateral de la aseguradora por falta de pago con las primas, la aseguradora tendrá que continuar proveyendo cobertura hasta que devuelva las primas no devengadas, momento en que se considera efectiva la cancelación.

Posteriormente, en Reyes Ayala v. Torres Amaral, 130 D.P.R. 730 (1992), este Tribunal resolvió que **cuando la**

**financiera es la que solicita la cancelación de la póliza por falta de pago del financiamiento, la financiera se coloca en los "zapatos del asegurado".** (Énfasis nuestro). En esas circunstancias, según dicho precedente, la cancelación tiene efecto inmediato. *Íd*. Véase, además, 6 <u>Appleman On Insurance</u>, *supra*. Si bien algunas jurisdicciones estatales han descrito la cancelación de la póliza a petición de la financiera como una cancelación en contra de la voluntad del asegurado, dicho análisis se ha hecho para resaltar el deber que algunas jurisdicciones imponen a las aseguradoras de notificar al asegurado antes de proceder con la cancelación. *Íd*. No obstante, tanto la jurisprudencia como la doctrina aplicable coinciden en que dicha cancelación debe ser considerada como una cancelación a solicitud del asegurado. Sobre el particular nos dice Couch:

> **Generally, it has been held that cancellation by a premium finance company is the same as though the insured has cancelled directly.** Accordingly, where an insured has executed a power of attorney authorizing a premium finance company to cancel, and the company requests cancellation as insured´s attorney-in-fact, the insurer is not required to give the insured notice of cancellation. 2 <u>Couch on Insurance</u>, *supra,* pag. 31-57. (Énfasis nuestro). Véase, además, <u>Reyes Ayala v. Torres Amaral</u>, *supra*, citando a <u>Georgia Ins. Co. V. White,</u> 370 S.E. 2d 525, 526 (Ga. App., 1989) y <u>Prudential Property & Casualty Ins. Co. V. Safeguard Mtu. Ins. Co.,</u> 528 F. Supp. 709 (D.C. 1981).

En atención a ello, es forzoso concluir que la cancelación de la póliza a petición de la financiera no debe ser considerada como una cancelación por falta de pago con las primas de seguro para efectos de la cláusula IX del contrato de seguro en controversia. Téngase presente que cuando se cancela una póliza por falta de pago de las primas se trata de una cancelación unilateral por parte de la aseguradora, no del asegurado. Además, en el caso de autos, la aseguradora había recibido el 100% de los pagos de las primas. En ese sentido, la comparecencia de la aseguradora al contrato de financiamiento persigue garantizar que todas las partes –incluyendo la aseguradora– reconozcan la cesión que hace el asegurado a favor de la financiera, el cual se extiende al poder de solicitar la cancelación de la póliza, a pesar de que se han pagado la totalidad de las primas. Dicho poder está regulado por el contrato de financiamiento y el contrato de póliza seguro. 2 Couch on Insurance, *supra,* pág. 31-55.

Dado que el contrato de financiamiento –de por sí– no altera los derechos adquiridos por el asegurado en el contrato de seguro, sino más bien se limita a cederlos a la financiera tal como éstos fueron establecidos en el contrato de seguro, es lógico concluir que dichos derechos sólo pueden ser variados modificando el contrato de seguro. Nada hay en el contrato de financiamiento suscrito por las partes en el caso de autos que nos lleve a pensar que de alguna forma éste alteró el contrato de seguro, incluyendo

la cláusula IX sobre la extensión del término para notificar una reclamación a la aseguradora aun después de cancelada la póliza. Más aún, el Código de Seguros de Puerto Rico requiere, como requisito formal para que un documento posterior altere el contrato de seguro, que éste se haga formar parte del contrato original. Art. 11.180 del Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, 26 L.P.R.A. sec. 1118. Ello, claramente, no ocurrió en el caso de autos.[54]

A la luz de lo anterior, somos del criterio que SIMED debe proveer cobertura en el caso de la demanda presentada por la señora Acevedo Mangual y notificada dentro de los 60 días de la cancelación de la póliza por hechos ocurridos antes de la cancelación. Tales hechos ocurrieron mientras la póliza estaba vigente y fueron notificados dentro del término provisto por la cláusula IX del contrato de seguro.

Siguiendo la jurisprudencia de este Tribunal en cuanto a que una solicitud de cancelación por parte de la financiera por falta de pago con el financiamiento debe entenderse como una hecha a solicitud del asegurado, entendemos que es incorrecta la alegación de la aseguradora de que dicha cancelación debe ser considerada como una por falta de pago con las primas para fines de la cláusula IX del contrato de seguro. Ahora bien, conforme a lo expresado

---

[54] Sobre la conveniencia de adjuntar cualquier modificación a un contrato de seguro al documento original, véase 2 Couch on Insurance, *supra*, sec. 25:5, y 4 Appleman on Insurance, *supra*, sec. 20.6; 2 Appleman on Insurance, *supra*. sec. 8.3.

por este Tribunal anteriormente, en estos casos la cancelación de la póliza será inmediata una vez la financiera así lo solicite, sin necesidad de esperar a que la aseguradora devuelva las primas no devengadas. Por lo tanto, el término de 60 días debe computarse a partir del momento en que se solicita la cancelación y ésta es efectiva. Véase Reyes Ayala v. Torres Amaral, *supra.*

No hay duda de que en el caso de autos dicha notificación ocurrió dentro del período de 60 días a partir del momento en que fue efectiva la cancelación solicitada por BT Finance. En vista de ello, coincidimos con la Opinión del Tribunal en que SIMED estaba obligada por el contrato de seguro otorgado entre ésta y el Dr. Colón Ledeé a proveer la cobertura correspondiente.

Por las razones expuestas anteriormente, estamos conforme con la Opinión del Tribunal que revoca la Sentencia dictada por el Tribunal de Apelaciones en el caso de autos.


                                        Federico Hernández Denton
                                            Juez Presidente